**Sherry LAO and Betty Yates, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**WICKES FURNITURE COMPANY, INC.; Sun Capital Partners, Inc.; Sun Capital Partners II, LP; and R.T.G. Furniture Corporation Defendants.**

**No. EDCV 06 448 SGL OPX.**

United States District Court, C.D. California.

Oct. 4, 2006.

---

Darren D Daniels, Marc D Roberts and Associates, Marc D Roberts, Marc D Roberts & Associates, Raphael Albert Katri, Marc D Roberts and Associates, Ontario, for Sherry Lao individually and on behalf of all others similarly situated, Betty Yates individually and on behalf of all others similarly situated, Plaintiffs.

Anne Marie Estevez, Morgan Lewis and Bockius, Miami, FL, Barbara J Miller, Morgan Lewis and Bockius, Jesse Elijah Maram Randolph, Morgan Lewis and Bockius, Irvine, Anne Marie Estevez, Morgan Lewis and Bockius, Miami, FL, for Wickes Furniture Company Inc a Delaware corporation, Sun Capital Partners Inc a Florida corporation, Sun Capital Partners II LP, a Delaware limited partnership, Sun Capital Partners LLC, a Delaware limited liability company, Sun Capital Advisors II LP, a Delaware limited partnership, Rooms To Go Inc a California corporation, RTG Furniture Corp a Florida corporation, Master Home USA Inc a Delaware corporation, Does 1 through 50 inclusive, Master Home USA Inc a Dela-

ware corporation, R T G Furniture Corp a Florida corporation, Rooms To Go Inc a California corporation, Sun Capital Advisors II LP a Delaware limited partnership, Sun Capital Partners LLC a Delaware limited liability company, Defendants.

## ORDER GRANTING PLAINTIFFS' MOTION TO REMAND

LARSON, District Judge.

This case requires the Court to examine the Class Action Fairness Act of 2005 ("CAFA"), a statute in which some major terms are left undefined, certain of the provisions of which have been aptly characterized as "bewildering" or "clumsily crafted," and whose legislative history is, in part, of questionable interpretive value. In short, it is a statute that is a headache to construe.

On April 7, 2006, plaintiffs filed a class action suit in San Bernardino County Superior Court. The proposed class represents those who were or still are employed as commissioned salespersons at Wickes Furniture Company, Inc.'s ("Wickes") showrooms in California from March 24, 2002, until the time a class is certified, a class potentially representing "hundreds of people." (First Am. Compl. ¶¶ 1, 26).[1] Plaintiffs allege that they regularly performed non-sales (and, hence uncompensated) work, such as attending meetings (some sponsored by the company and some by furniture vendors whose wares Wickes sold), cleaning the stores, and researching the prices charged by Wickes' competitors. They also allege that the commissions they earned from a sale were subject to being stripped, or in industry

jargon "housed," if they committed even inconsequential clerical errors in the sales paperwork. The complaint asserts state law claims for unpaid wages, unpaid overtime, unfair business practices, breach of contract, and a violation of California Labor Code § 226 (relating to the furnishing of wage statements).

The complaint further alleges that two of the other defendants named in the complaint, Sun Capital Partners, Inc., and Sun Capital Partners II, LP (collectively "Sun Capital"), jointly managed and operated the showrooms in question and, in conjunction with Wickes, were "plaintiffs' joint employers." (First Am. Compl. ¶ 10).[2] Indeed, the complaint paints a portrait of Sun Capital as being the moving force behind the actions alleged in the complaint, terming Wickes itself "as a mere shell and conduit" for Sun Capital and, at other points, labeling Wickes as an "alter ego" of Sun Capital. (First Am. Compl. ¶ 11). Such an intermingling in the other defendants' business structure with Wickes prompted plaintiffs to seek to hold all the defendants jointly liable for any liability incurred. (First Am. Compl. ¶ 12 ("defendants and each of them should respond, as a whole, for the debts and liabilities of this integrated enterprise. Accordingly, defendants and each of them should be considered plaintiffs' employer and liable for the acts and omissions as stated herein")).

On May 2, 2006, defendants removed the action to this Court pursuant to CAFA, 28 U.S.C. § 1332(d). Presently before the Court are plaintiffs' motion to remand,

---

1. The Court makes reference to the amended complaint throughout its opinion even though, at the time of removal, the operative pleading was plaintiffs' original complaint because, save for omissions regarding certain defendants later voluntarily dismissed by

plaintiffs (that is, Sun Capital Partners, LLC, and Sun Capital Advisors II, LP), the two pleadings are identical.

2. The other defendant named in the complaint is Room to Go Furniture Corporation.

defendants' opposition thereto, plaintiffs' reply, and defendants' surreply. For the reasons set forth below, the Court **GRANTS** the motion to remand.

In its motion, plaintiffs posit three reasons why remand is required, all of which are tied to the provisions allowing removal under CAFA: (1) The $5 million amount-in-controversy requirement for removal under the Act contained in subsection (d)(2) is not met; (2) the action falls within the home-state controversy bar from removal jurisdiction contained in subsection (d)(4)(B); and (3) the matter falls within the local controversy bar from removal jurisdiction contained in subsection (d)(4)(A).

## A. AMOUNT IN CONTROVERSY

■ Insofar as the amount in controversy requirement contained in CAFA is concerned, the Ninth Circuit has already held that it is the removing party, that is, defendants, who bear the burden of proof. *See Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 685 (9th Cir.2006).

Subsection (d)(2) grants federal district courts jurisdiction over any class action governed by CAFA in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, provided the minimal diversity requirements of the Act are met. Both sides agree that minimal diversity exists in this case as at least one named defendant is a citizen of a State different from that of a member of the proposed class. *See* 28 U.S.C. § 1332(d)(2)(A). The only question is in defendants' valuation of the amount in controversy contained in their notice of removal.

The process of determining the amount in controversy is relatively straightforward:

> The question is not what damages the plaintiff will recover, but what amount is 'in controversy' between the parties. That the plaintiff may fail in its proof, and the judgment be less than the threshold (indeed, a good chance that the plaintiff will fail and the judgment will be zero) does not prevent removal. Once the proponent of jurisdiction has set out the amount in controversy, only a 'legal certainty' that the judgment will be less forecloses federal jurisdiction.

> Application of the *St. Paul Mercury* "legal certainty" standard usually is straightforward when the plaintiff wants to be in federal court. Then the complaint will contain allegations that, if established at trial, would justify a judgment exceeding the jurisdictional minimum.... The demonstration concerns what the plaintiff is claiming (and thus the amount in controversy between the parties), not whether plaintiff is likely to win or be awarded everything he seeks.

*Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 448–49 (7th Cir.2005)(citing *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938)).

In the notice of removal defendants posited that the potential value of the first claim for unpaid wages was worth in excess of $6,000,000 when one aggregates, as CAFA requires, *see* 28 U.S.C. § 1332(d)(6), the value of the claims of all the proposed class members. Defendants calculate the value of plaintiffs' second claim for waiting-time penalties as potentially topping $2,000,000. Plaintiffs have raised two objections to the method employed by defendants in arriving at these numbers. First, in their remand motion, plaintiffs quibbled only with how defendants calculated the number of proposed class members: "Defendants provided the Court with damages calculations based on the total number of proposed plaintiffs, instead of Full Time

Equivalents ('FTEs')." This method is completely inadequate because most of the proposed plaintiffs were not employees of Wickes during the entire limitations period. Thus, defendants' calculations, which are based on the total amount of proposed plaintiffs during the entire limitations period of this lawsuit, produces inflated numbers solely for the purpose of establishing federal subject matter jurisdiction. (Pls' Mot. Remand at 12).

When defendants in their opposition noted that their calculation was in fact based on such FTEs (Defs' Opp. at 16–18), plaintiffs shifted gears and posited that the problem with defendants' calculation was one of timing, specifically objecting to defendants' calculating the amount of potential damages plaintiffs' class in the aggregate could be awarded by using both the four years immediately preceding the filing of the complaint and defendants' estimate that it will take two more to take the case to trial. (Defs' Opp. at 16–18; Pls' Reply at 13–14). As explained by plaintiffs, determination of the amount in controversy is made at the time of removal and, additionally, allowing defendants to calculate potential damage awards into the future would mean that CAFA's amount in controversy requirement would always be met, as "[w]hat would stop" a defendant from "calculating damages for an indefinite and arbitrary period." (Pls' Reply at 13).

The Court is not unsympathetic to plaintiffs' argument, but notes that some of the blame lies with how plaintiffs drafted their complaint. The complaint makes plain that it seeks to recoup unpaid wages from March 24, 2002, up "until the time a class is certified." (First Am. Compl. ¶ 1). Thus, the complaint itself posits the potential of damages flowing to the proposed class to a future, as of yet undetermined, date. While it is true that defendants seek to calculate damages up until the "the time

of trial," which goes well beyond the scope of the damages proposed in the complaint, that there is potential future damages to calculate at all is solely the function of plaintiffs' draftsmanship. That said, even limiting defendants' calculation to just the four-year period preceding the filing of the complaint does not advance plaintiffs' cause. Under defendants' calculus, the claim for unpaid wages would be worth $4,000,000, if it was so limited, and the claim for waiting-time penalties would be worth approximately $1.3 million, which, when added together, would exceed $5,000,000.

Accordingly, the Court finds that the $5 million amount in controversy requirement contained in section 1332(d)(2) has been met.

## B. LOCAL CONTROVERSY AND HOME–STATE RULE UNDER (D)(4)(A)-(B)

██ The thornier issue is who bears the burden of proof with respect to the local controversy and home-state rule provisions contained in section 1332(d)(4), a question that has not been addressed by the Ninth Circuit.

Subsection (d)(4) provides that a district court "shall decline to exercise jurisdiction" if one of two circumstances are present. Under the "home state controversy," district courts must decline jurisdiction where two-thirds or more of the class members and the "primary" defendants are citizens of the state where the action was originally filed. *See* 28 U.S.C. § 1332(d)(4)(B). Under the "local controversy" test, district courts must decline jurisdiction where four circumstances exist: (1) more than two-thirds of the class members are citizens of the state where the action was originally filed; (2) there is at least one defendant from whom "significant relief" is sought by the class mem-

bers, whose alleged conduct forms a "significant basis" for the asserted claims, and who is a citizen of the state where the action was originally filed; (3) the principal injuries suffered by the class were incurred in the state where the action was originally filed; and (4) no other class action asserting the same or similar factual allegations has been filed against any of the defendants within the past three years. *See* 28 U.S.C. § 1332(d)(4)(A).

Defendants point to no language in CAFA, and the Court has not uncovered any, evincing an intent on Congress' part to place the burden in establishing any of subsection (d)(4)'s provisions on plaintiffs as the non-removing party. This is not surprising as the Ninth Circuit has noted that "there simply is no language in the statute regarding the burden as to remand." *Id.* at 683. Instead, defendants direct the Court to language from the Senate Judiciary Committee Report that was "issued ten days *after* CAFA's passage into law," *id.* (emphasis added), which states:

> It is the Committee's intention with regard to each of these exceptions that the party opposing federal jurisdiction shall have the burden of demonstrating the applicability of an exemption. Thus, if a plaintiff seeks to have a class action remanded under section 1332(d)(4)([B]) on the ground that the primary defendants and two-thirds or more of the class members are citizens of the home state, that plaintiff shall have the burden of demonstrating that these criteria are met by the lawsuit.

S.Rep. No. 109–14, at 44. This language from the committee report certainly would support defendants' position. The problem is that the report speaks to nothing in the statute itself; instead, the report seeks to fill in the gaps caused by the statute's silence on the point. Such use of legisla-

tive history is ill-advised. *See Abrego,* 443 F.3d at 683 ("[C]onsideration of legislative history is appropriate where statutory language is ambiguous. Ambiguity, however, is at least a necessary condition. In this instance, the statute is not ambiguous. Instead, it is entirely silent as to the burden of proof on removal"); *International Broth., of Elec. Workers, Local Union No. 474, AFL–CIO v. N.L.R.B.,* 814 F.2d 697, 712 (D.C.Cir.1987)("courts have no authority to *enforce* principles gleaned *solely* from legislative history that has no statutory reference point") (emphasis in original)(citing *United States v. American College of Physicians,* 475 U.S. 834, 841, 106 S.Ct. 1591, 89 L.Ed.2d 841 (1986)).

Moreover, use of the committee's report in interpreting CAFA's provisions is particularly problematic on a more fundamental level. Given that the committee's report was issued nearly two weeks *after* CAFA was enacted into law, using the Senate Report's post-statutory enactment commentary arguably runs afoul of the canon that legislative history unconnected to the enactment of a specific statute is given little interpretive weight. *See Public Employees Retirement Sys. of Ohio v. Betts,* 492 U.S. 158, 168, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989)("the interpretation given by one Congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute"). Perhaps the most cogent explanation for this canon assigning little weight to post-enactment legislative history was provided by Justice Scalia:

> The legislative history of a statute is the history of its consideration and enactment. "Subsequent legislative history"—which presumably means the post-enactment history of a statute's consideration and enactment—is a contradiction in terms. The phrase is used to smuggle into judicial consideration legis-

lators' expressions not of what a bill currently under consideration means (which, the theory goes, reflects what their colleagues understood they were voting for), but of what a law previously enacted means.

It seems to be a rule for the use of subsequent legislative history that the legislators or committees of legislators whose post-enactment views are consulted must belong to the institution that passed the statute. Never, for example, have I seen floor statements of Canadian MP's cited concerning the meaning of a United States statute; only statements by Members of Congress qualify. No more connection than that, however, is required. It is assuredly not the rule that the legislators or committee members in question must have considered, or at least voted upon, the particular statute in question—or even that they have been members of the particular Congress that enacted it. The subsequent legislative history rejected as inconclusive in today's footnote, for example, tells us (according to the Court's analysis) what committees of the 99th and 95th Congresses thought the 76th Congress intended.

In my opinion, the views of a legislator concerning a statute already enacted are entitled to no more weight than the views of a judge concerning a statute not yet passed. In some situations, of course, the expression of a legislator relating to a previously enacted statute may bear upon the meaning of a provision in a bill under consideration—which provision, if passed, may in turn affect judicial interpretation of the previously enacted statute, since statutes *in pari materia* should be interpreted harmoniously. Such an expression would be useful, if at all, not because it was subsequent legislative history of the earlier

statute, but because it was plain old legislative history of the later one.

Arguments based on subsequent legislative history, like arguments based on antecedent futurity, should not be taken seriously, not even in a footnote. *Sullivan v. Finkelstein,* 496 U.S. 617, 631–32, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)(Scalia, J., concurring); *see also New York State Dept. of Social Servs. v. Dublino,* 413 U.S. 405, 431 n. 11, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973)(Marshall, J., dissenting)("Congress, in enacting a statute, may fairly be taken to have endorsed the interpretations offered in such [floor] exchanges [between the bill's sponsors]. None of this is true of post-enactment floor exchanges, which have no bearing on pending legislation and to which a disinterested legislator might well pay scant attention").

Such criticism is particularly cogent in relation to using the committee report to construe CAFA's terms. The fact that the committee report was issued *after* CAFA had already been enacted into law should give pause as to whether the legislative history truly reflects the views of the enacting Congress, or whether the issuance of the report was meant to declare the intent of particular members, their staff, or lobbyists seeking to achieve what they could not through passage of the statutory text itself. The Supreme Court has cautioned that "judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text." *Allapattah Services,* 125 S.Ct. at 2626. This word of caution would seem to be particularly di-

rected to a statute, such as CAFA, that was enacted into law only after repeated failed efforts to secure its passage. *See* S.Rep. No. 109–14 at 1–3 (consideration of CAFA "began ... in the 105th Congress" in 1997 with its introduction as a bill, but "no further action was taken" in the 105th Congress; the bill was reintroduced in 1999 in the 106th Congress, was reported favorably out of committee, but nothing further occurred; the Senate "continued consideration" of the bill in the 107th Congress when the bill was re-reintroduced, but that "no further action was taken"; the bill was then considered again in 2003, made its way out of committee but was filibustered on the Senate floor, prompting the bill sponsors to "negotiate" with opponents the bill's "key provisions"; a compromise bill was introduced in 2004, but was again filibustered, which then led to introduction of Senate Bill No. 5, which eventually became CAFA).

This legislative background caused the Ninth Circuit in *Abrego* to look askance at the very committee report under consideration in this case:

> When the legislative history stands by itself, as a naked expression of "intent" unconnected to any enacted text, it has no more force than an opinion poll of legislators—less, really, as it speaks for fewer. Thirteen Senators signed this report and five voted not to send the proposal to the floor. Another 82 Senators did not express themselves on the question; likewise 435 Members of the House and one President kept their silence. Naked legislative history has no legal effect. The rule that the proponent of federal jurisdiction bears the risk of non-persuasion has been around for a long time. To change such a rule, Congress must enact a statute with the President's signature (or by a two-thirds majority to override a veto). A declaration by 13 Senators will not serve.

*Id.* at 685–86 (quoting *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 448 (7th Cir.2005)). It was for this reason that the Ninth Circuit noted that the committee's report "is entitled to exceptionally little weight." *Id.* at 687. Rather than relying on the committee report as the beginning and end of the analysis, the Court will instead undertake a more traditional path to construing the statute: Examining the statute's language and structure to interpret its meaning, with resort to legislative history in that exercise only as a supplementary tool and, even then, only insofar as the report speaks to the statute's language, as opposed to a mechanism to fill in statutory silence.

Prior to CAFA, diversity jurisdiction under section 1332 required that the amount in controversy exceed $75,000 and that suit be between "citizens of different States." 28 U.S.C. § 1332(a). The Supreme Court long ago interpreted section 1332(a) as requiring "complete diversity" to exist, meaning that no plaintiff could be from the same state as any defendant. *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). In class action suits only the citizenship of the named plaintiff counted, *see Snyder v. Harris*, 394 U.S. 332, 340, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), and even then each individual plaintiff's claim had to exceed the amount in controversy in order for diversity jurisdiction to exist. *See Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). "Congress is naturally free to expand or contract the statutory diversity jurisdiction, and it has done so from time to time." *Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 676 (7th Cir.2006). Through CAFA Congress changed much of this preexisting understanding of diversity jurisdiction in the context of large class action suits. *See Allapattah Services*, 125 S.Ct. at 2627–28

(recognizing that CAFA "abrogates the rule against aggregating claims"); *Abrego,* 443 F.3d at 684 (listing the various ways CAFA has changed existing diversity jurisprudence in the context of class action suits). Congress did so by amending section 1332 to include a new subsection (d) and by adding section 1453 to title 28 of the United States Code, the latter setting forth provisions for the removal of class actions.

Section 1332(d)(2) begins by granting district courts "original jurisdiction" and then goes on to define the governing criteria, namely that the amount in controversy exceed $5 million and that the case involves a class action where there exists minimal diversity—that is, where just one of the plaintiffs has citizenship different from that of any defendant. This relaxation of the complete diversity requirement in class actions to one requiring only minimal diversity, however, was not complete. Congress still wished to keep out of federal courts those class action cases that were essentially local in nature. *See* Pub.L. 109–2, 119 Stat. 4, 5 (2005)(listing as one of the purposes for CAFA as ensuring "Federal court consideration of interstate cases of *national* importance under diversity jurisdiction" (emphasis added)).

To that end, the next two subsections in the statute set out parameters for when such a local class action case exist. Subsection (d)(3) describes situations in which the district court "may ... decline to exercise jurisdiction under paragraph (2)" where "greater than one-third but less than two-thirds of" class members and the "primary defendants are citizens of the State in which the action was originally filed." Next, subsection (d)(4), in language that clearly contrasts with the discretional language of subsection (d)(3), emphatically commands that a "district court *shall* decline to exercise jurisdiction under para-graph (2)" (emphasis added) when either the local controversy or home state controversy tests are met.

CAFA also identifies certain types of class action cases wherein "[p]aragraph 2 shall not apply" (again, using non-discretionary language): It is inapplicable to class actions in which the "primary defendants" are states or state officials, suits where the proposed class numbers "less than 100," an action concerning a "covered security" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, suits relating to the internal governance of a corporation or other business entity, or those cases involving duties and obligations pursuant to any security covered by the Securities Act of 1933. *See* 28 U.S.C. § 1332(d)(5), (9).

Defendants argue that this statutory language and structure makes clear that (d)(4)'s provisions are more akin to statutory exceptions to removal than part of (d)(2)'s jurisdictional criteria. This characterization is important because, at the time of CAFA's passage, the Supreme Court in *Breuer v. Jim's Concrete of Brevard, Inc.,* 538 U.S. 691, 123 S.Ct. 1882, 155 L.Ed.2d 923 (2003), had recognized that the opponent of removal under 28 U.S.C. § 1441(a) must prove that there is an express exception to removability. In essence, defendants argue that "the relation between subparts (d)(2) and (d)(4) of CAFA is analogous to the structure of 28 U.S.C. § 1441(a)." *Hart,* 457 F.3d at 680. If defendants' analogy to section 1441(a) holds, it would weigh heavily in this Court's analysis as upon whom the burden of persuasion lies in this case. *Cf. Abrego,* 443 F.3d at 684 (noting that in construing CAFA courts should be mindful that, "[g]iven the care taken in CAFA to reverse *certain* established principles but not others, the usual presumption that Congress legislates against an understanding

of pertinent legal principles has particular force").

Other courts have accepted the analogy proffered by defendants and placed the burden on establishing (d)(4)'s provisions on the non-removing party. *See Hart*, 457 F.3d at 681 (holding "that the plaintiff has the burden of persuasion on the question whether the home-state or local controversy exceptions apply"); *Frazier v. Pioneer Americas LLC*, 455 F.3d 542, 546 (5th Cir.2006)(noting that the "longstanding § 1441(a) doctrine placing the burden on plaintiffs to show exceptions to jurisdiction" serves to "buttress[ ] the clear congressional intent to do the same with CAFA"); *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1165 (11th Cir.2006) (analogizing to *Breuer*, "we hold that the plaintiffs bear the burden of proving the local controversy exception to the jurisdiction otherwise established" by the provisions in (d)(2)). The Court is not convinced that such an analogy is appropriate.

Section 1441(a) provides that, "except as otherwise expressly provided by Act of Congress," a case in state court is removable to the federal court "embracing the place where such action is pending" if the federal court would otherwise "have original jurisdiction" over the matter. In *Breuer*, it was noted that "since 1948 . . . there has been no question that whenever the subject matter of an action qualifies it for removal, the burden is on a plaintiff to find an express exception" to removal by

proving the application of a separate statute barring removal. The analogy between the two clauses in section 1441(a) and those set forth in subsections (d)(2) and (d)(4) is far from inevitable or obvious. Indeed, the court in *Hart* admitted that such an analogy "is not perfect." 457 F.3d at 680.

For this analogy to hold, it must be found that subsection (d)(4)'s provisions serve as an *exception* to the district court having jurisdiction over the matter. A review of CAFA's statutory structure and language serves to negate any such impression of subsection (d)(4)'s provisions. CAFA amended section 1332 and created a new section 1453. In reading those amendments it is clear to the Court that Congress used particular phraseology when it wished to signify what it considered to be an "exception" to CAFA's jurisdictional/removal provisions.[3] Section 1453, for instance, contains a subsection titled "Exception" and then uses the following introductory phrase before listing those removal exceptions: "This section *shall not apply to* any class action that solely involves" a claim for a "covered security" or fiduciary actions under the Securities Act of 1933 and the Securities Exchange Act of 1934, and actions concerning intra-corporate governance. 28 U.S.C. § 1453(d)(emphasis added). What is notable about section 1453(d) is the phrase that sets off these "exceptions" to

---

3. The Court speaks to CAFA's removal and jurisdictional provisions interchangeably only because the statute itself employs the terms as being one and the same. *Compare* 28 U.S.C. § 1332(d)(2) ("The district courts shall have original jurisdiction") *with* 28 U.S.C. § 1332(d)(11)(referring to actions "removable under paragraphs (2) through (10)"). The Ninth Circuit itself noted that the statute in this regard was crafted clumsily. *Abrego*, 443 F.3d at 681. The source for this linguistic conflation of what are otherwise distinct legal

concepts stems from the fact that Congress inserted removability provisions into section 1332, a statute that previously concerned only a district court's original jurisdiction in diversity cases. *Id.* at 682 ("Congress's use of the word 'removable' in the text of § 1332, a statute establishing original jurisdiction, blurs what had previously been a clear distinction between jurisdiction and removal statutes, and thus obscures the reach of jurisdiction" over CAFA's provisions).

removal: "shall not apply to." Some of the amendments to section 1332(d) use similar phraseology, but not in relation to subsection (d)(4). Instead, the amendments to section 1332(d) that contain the phrase "shall not apply to" are found in subsections (d)(5) and (d)(9) and, in all save one case (that is, subsection (d)(5)), those amendments concern the same type of actions referenced as "exceptions" to removal in section 1453(d). *See* 28 U.S.C. §§ 1332(d)(5), (9).

Subsection (d)(4), in contrast, introduces its provisions with the following language: "A district court shall decline to exercise jurisdiction under paragraph (2)." This language is also used in subsection (d)(3), but in the permissive, "[a] district court may ... decline to exercise jurisdiction under paragraph (2)." The Court must presume that Congress intentionally used this difference in phraseology with some purpose in mind. *See* 2A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 46:6 (6th ed. 2005)("[C]ourts do not construe different terms within a statute to embody the same meaning.... [W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended. In like manner, where the legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded. The use of different terms within related statutes generally implies that different meanings were intended").

If subsection (d)(4) was nothing more than another statutory exception to removal, one would presume Congress would have introduced it in the same manner as it had done with other provisions in the same statute speaking to that issue. *See Id.* ("There is a presumption that the same words used twice in the same act have the same meaning"). Indeed, the very statute that defendants and the other courts have pointed to as analogous to subsection (d)(4)—section 1441(a)—uses language much more closer to that used by Congress in reference to removal exceptions in subsections (d)(5) and (d)(9) to section 1332 and to subsection 1453(d) than it does in reference to subsection (d)(4). Section 1441(a) states that, "except" as provided, district courts have jurisdiction over matters they otherwise would possess. Subsections (d)(5) and (d)(9) (as well as section 1453(d)) state, in essence, that a district court's jurisdiction as provided in subsection (d)(2) shall not apply as provided. Subsections (d)(3) and (d)(4) speak differently, referencing when a district court may or must "decline" to "exercise jurisdiction" provided in subsection (d)(2). Given that, as a matter of the statutory structure and language, subsection (d)(4) cannot be seen as an exception to removal; Congress consciously used terminology—terminology different from what it employed in identifying exceptions to removal—in explaining the effect of its provisions. This leaves the question of how Congress intended (d)(4) to be characterized.

One reason given by those courts that do not contemplate subsection (d)(4) as something other than a jurisdictional exception is the fact that the language of (d)(4) is not contained in subsection (d)(2) itself, which contains the words "district courts shall have original jurisdiction." *See Hart,* 457 F.3d at 681 (noting "case might be different if Congress had put the home-state and local controversy rules directly into the jurisdictional section of the statute, § 1332(d)(2), but it did not"). If subsection (d)(4) was not an exception to removal, so this reasoning goes, why did not Congress place its provisions in the portion of the statute talking about the existence of jurisdiction. This reasoning, however, elevates form over substance.

Such proximity to the grant of jurisdiction did not bar the Supreme Court from finding that the "except" clause in section 1441(a) nonetheless served as a statutory exception to removal. Nor in CAFA did Congress find such proximity necessary in tying other statutory provisions as part of (d)(2)'s jurisdictional criteria. Other subsections in the statute expressly apply to subsection (d)(2)'s jurisdictional inquiry without having been converted into statutory exceptions because of their distance from (d)(2)'s provisions. For example, the Ninth Circuit in *Abrego* found that subsection (d)(11)'s provisions concerning "mass actions" formed a part of subsection (d)(2)'s jurisdictional inquiry such that the burden of proof on establishing its provisions fell on the removing party. 443 F.3d at 686.

Another reason given for considering subsection (d)(4) as a statutory exception arises from the strange linguistic formulation introducing its provisions—district courts "shall decline to exercise jurisdiction under paragraph (2)." The Court is not aware of, and the parties have not directed the Court to, any other federal statute employing this precise phrase. Subsection (d)(4)'s introductory phrase is unique. The formulation, given its discussion of a district court's jurisdiction and declining to exercise the same, could be seen as signifying either Congress' attempt to create a form of statutory abstention, or simply its inartful way of further refining subsection (d)(2)'s jurisdictional criteria.

Subsection (d)(4) is read by defendants as the former, not the latter. They argue that subsection (d)(4) does not concern the existence of a court's jurisdiction, but rather as something more analogous to situations when a court can or should abstain from exercising jurisdiction it already possesses.

As posited by defendants: "Merely declining to exercise subject matter jurisdiction ... presumes that subject matter jurisdiction exists to begin with. How else could a court decline to do something unless there were in fact something—in this case jurisdiction—to decline?" (Defs' Opp. at 10 n. 7). Defendants' implicit analogy to abstention doctrine is understandable. Abstention doctrines represent limited exceptions to the federal court's "virtually unflagging obligation" to exercise the jurisdiction that has been given to them, *see Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), and courts typically place the burden of establishing the applicability of an abstention doctrine on the party opposing the exercise of federal jurisdiction. *See, e.g., Communications Telesystems Int'l v. California Public Utility Com'n*, 196 F.3d 1011, 1020 (9th Cir.1999)(placing burden of proof on party seeking to evoke abstention).

The Court is reluctant to ascribe such a meaning to subsection (d)(4)'s provisions, however, if for no other reason than the fact that, outside of CAFA, there would exist no other creature like it in the law. As one learned treatise described abstention: "Abstention doctrines are *judicially created and self-imposed limitations* on court's adjudication of cases that are properly within their jurisdiction. As such, abstention doctrines represent a kind of voluntary abdication of a court's rightful jurisdiction and are in tension with a right to federal court access that Congress has conferred through various jurisdictional statutes." 17A James Wm. Moore Et Al., Moore's Federal Practice § 122.01[1] at 122–7 (3rd ed.2006)(emphasis added). Far from signifying an awkward attempt by Congress to take away power *Congress had given to the courts (a task much more*

easily accomplished by simply introducing subsection (d)(4)'s provisions with the phrase "shall not apply to"), the Court construes subsection (d)(4)'s provisions as serving as a supplement to the jurisdictional criteria found in (d)(2); in other words, the rules found in subsection (d)(4) are part and parcel of the jurisdictional definition set forth in subsection (d)(2).

Subsection (d)(4)'s provisions speak to the same precise factual inquiry as that used in subsection (d)(2) to define the court's "original jurisdiction"—the citizenship of class members and that of defendants. The difference being that, while subsection (d)(2) speaks in general of employing minimal diversity to establish jurisdiction over a class action, subsection (d)(4) notes those areas where this minimal diversity inquiry has its limits. Subsection (d)(4)'s inquiry is, therefore, inextricably intertwined with that underlying (d)(2)'s criteria. In contrast, the provisions in subsections (d)(5) and (d)(9) concern when subsection (d)(2) shall not apply to certain types of *cases* or types of *parties* (such as when state officials are being sued or those that involve covered securities or the internal governance of a business), an inquiry separate and apart from the factual inquiry underlying subsection (d)(2)'s criteria. That subsection (d)(4)'s provisions overlap so neatly and precisely with those in subsection (d)(2) lends support to the view that subsection (d)(4) forms a part of subsection (d)(2)'s jurisdictional criteria.

The Court's reading of the language and structure of CAFA is reconfirmed by those portions of the committee report that actually provide Congress' characterization of subsection (d)(4)'s provisions. The legislative history itself struggles with the nature of subsection (d)(4)'s strange juxtaposition of the word "decline" with the word "jurisdiction," but ultimately speaks of the sub-section's provisions as forming a part of a court's jurisdictional inquiry under CAFA:

> The bill grants the federal courts original jurisdiction to hear interstate class action cases where (a) any member of the proposed class is a citizen of a different state from any defendant; and (b) the amount in controversy exceeds $5 million (aggregating claims of all purported class members, exclusive of interest and costs).

> The bill, however, includes several provisions ensuring that where appropriate, state courts can adjudicate certain class actions that have a truly local focus. The first is the "Home State" exception. Under this provision, if two-thirds or more of the class members are from the defendant's home state, the case *would not be subject to federal jurisdiction.*

. . . . .

> In addition, S. 5 contains a "Local Controversy Exception" intended to ensure that state courts can continue to adjudicate truly local controversies in which some of the defendants are out-of-state corporations. In order to fall within the Local Controversy Exception, a class action must meet the following four criteria: (1) The class must be primarily local, meaning that more than two-thirds of class members must be residents of the state in which the action was filed; (2) at least one real defendant (whose alleged conduct is central to the class's claims and from whom the class seeks significant relief) must also be local; (3) the "principal injuries" caused by the defendants' conduct must have occurred in the state where the suit was brought; and (4) no other similar class actions have been filed against any of the defendants (by the same or other proposed classes) in the preceding three years. If all of these four criteria are satisfied, the

case *will not be subject to federal jurisdiction under the bill.*

S.Rep. No. 109–14 at 28 (emphasis added).

In another section, the Senate Report labels subsection (d)(4)'s provisions as forming a part of the statute's "jurisdictional principles," and expressed the desire that they be read narrowly so as not to become "jurisdictional loopholes":

> While the core concept of the bill is that class actions filed against defendants outside their home state are subject to federal jurisdiction if citizens from different states are on opposing sides and more than $5 million is at issue, new subsections 1332(d)(3) and (d)(4)(B) address *the jurisdictional principles* that will apply to class actions filed against a defendant in its home state, dividing such cases into three categories.

S.Rep. No. 109–14 at 35.

To the Court, the most logical explanation is that, while subsections (d)(5) and (9) (as well as section 1453(d)) sought to create wholesale exceptions to what would otherwise fall within subsection (d)(2)'s provisions, subsection (d)(4) sought not so much to carve out an exception to (d)(2)'s provisions as to refine its terms. That is to say that subsections (d)(5) and (9) admit that (d)(2)'s provisions would otherwise apply to securities actions and internal corporate governance suits, *etc.*, while subsection (d)(4) seeks to explain that actions subject to its provisions were never covered by subsection (d)(2) provisions in the first instance. Subsections (d)(5) and (9) are therefore truly exceptions to (d)(2)'s removal provisions, while subsection (d)(4) forms a part and parcel of subsection (d)(2)'s definitional scope. *See* BLACK's LAW DICTIONARY 560 (6th ed.1990)(defining an exception in the context of statutory laws as "a clause designed to reserve or exempt some individuals from the general class of persons or things to which the language of the act in general attaches" and stating the purpose of a statutory exception "is to except something from the operative effect of a statute or to qualify or restrain the generality of the substantive enactment to which it is attached"); 2A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47:11 (6th ed. 2005)("Exceptions, like provisos, operate to restrict the general applicability of legislative language"). Given that subsection (d)(4) does not so much seek to strike or carve out something from the operative effect of subsection (d)(2), but rather is seen more as further elucidating (d)(2)'s definitional provisions, the Court finds that this subsection is not an exception to CAFA's jurisdictional provisions or an awkward form of statutory abstention, but an integral component of the removal provisions themselves. In light of this construction of the statute, the Court finds the decisions in *Hart, Frazier,* and *Evans* erroneous.

In addition to their statutory construction reasoning discussed above, the courts in *Evans* and *Frazier* also posited that policy reasons existed for placing the burden of proof of establishing subsection (d)(4)'s provisions on plaintiffs: "[T]hat the plaintiff was best positioned to collect the relevant evidence" needed to establish subsection (d)(4)'s provisions. *Hart,* 457 F.3d at 680. The court in *Evans* observed that, with respect to subsection (d)(4)(B), "plaintiffs have defined the class and have better access to information about the scope and composition of that class," *id.* at 1164 n. 3, and that, with respect to subsection (d)(4)(A), which requires proof of the principal harm suffered by the class and by whom that injury was caused, that while "defendants have better access to information about [their] conduct[,] ... plaintiffs have better access to information about which plaintiffs are injured and their relationship to various defendants." *Id.; see*

also *Frazier*, 455 F.3d at 546 (observing with approval to *Evans* the proposition that "the reality" is "plaintiffs are better positioned than defendants to carry this burden"). The Court does not disagree with these observations, but notes that they go only so far. Subsection (d)(4) not only requires the information noted by *Evans*, but also requires information concerning the citizenship of the "primary" or "significant" defendants, points nowhere addressed by *Evans*. This omission is significant as such information is oftentimes something that is solely and uniquely in the possession of the removing defendants. *See Hart*, 457 F.3d at 680 (finding *Evans'* policy rationale for placing the burden of establishing subsection (d)(4)'s provisions on plaintiffs "not persua[sive]"). Indeed, the facts in this case illustrate the point that at least part of the inquiry required under subsection (d)(4) concerns information to which a plaintiff is not in a better or even as good a position to obtain as the defendant.

Accordingly, the Court finds, as a matter of statutory construction, the burden of proving the elements outlined in subsection (d)(4) falls on the removing party. This finding is not without consequence. Much of the information used by the Court in applying subsection (d)(4)'s provisions in this case, *see infra*, was tendered by defendant only *after* the Court noted its tentative ruling with respect to the burden of proof question. But for defendants' submission of this additional information, plaintiffs' motion to remand would have been wanting.

■ CAFA requires courts to decline jurisdiction if two-thirds or more of the members of all the plaintiff class and the "primary" defendants are citizens of the original forum state. *See* 28 U.S.C. § 1332(d)(4)(B). Under these circumstances, known as the home state controversy, both plaintiffs and defendants are predominantly local, and local interests presumably predominate. Neither side seriously disputes that two-thirds or more of the proposed plaintiffs class are from California. Instead, their dispute centers on who is or are the "primary defendants" in this case and what is the citizenship of those defendant(s). Plaintiffs argue that only Wickes is a primary defendant in this case and that Wickes is a citizen of California. Defendants dispute that Wickes is the only primary defendant, arguing that Sun Capital, whom both sides acknowledge as having non-California citizenship, is also a primary defendant in this case on account of the fact that the complaint seeks to hold all the defendants liable on the claims alleged therein. Indeed, the complaint refers to Sun Capital as the proposed classes' "joint employer[ ]" along with Wickes, and terms Wickes as Sun Capital's shell or alter ego. Nowhere does the statute define what makes a defendant a "primary" defendant.

CAFA also requires courts to decline jurisdiction where more than two-thirds of the plaintiff class and at least one defendant who caused a significant amount of the harm suffered are citizens of the original forum state. *See* 28 U.S.C. § 1332(d)(4)(A). Under these circumstances, known as the local controversy rule, the citizenship of a "significant" defendant is crucial in elucidating its application (yet another term nowhere defined in the statute).[4]

---

4. Courts have used different methods for differentiating between who is and who is not a primary defendant and who is and who is not a significant defendant. *See Kearns v.*

*Ford Motor Co.*, 2005 WL 3967998, at *8 (C.D.Cal. Nov.21, 2005)(differentiating primary defendants as being those that are "potentially directly liable," as opposed to being

As with the previously-described home state controversy, the parties agree that more than two-thirds of the proposed plaintiff class is composed of individuals from California. Moreover, it appears that everyone in this case concedes that Wickes is a "significant" defendant to the instant litigation. The only dispute is over whether Wickes is a citizen of California. Given this convergence in the parties' positions with respect to application of the local controversy rule, the Court declines to resolve whether Sun Capital is or is not a "primary" defendant for purposes of the home state controversy rule, and will rests its decision on Wickes' citizenship, which here is dispositive. If the Court finds that Wickes is not a citizen of California, then neither the home state controversy rule nor the local controversy rule applies and the Court has jurisdiction over this matter. If, on the other hand, Wickes is found to be a citizen of California, then the Court would not have jurisdiction over this matter because, at the very least, the local controversy rule would apply.

## C. WICKES' CORPORATE CITIZENSHIP

 "For the purpose of diversity jurisdiction, a corporation is a citizen of any state where it is incorporated and of the state where it has its principal place of business." *Industrial Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990). Here, Wickes is incorporated under the laws of the State of Delaware. Thus, to defeat jurisdiction under CAFA it must be established that California is Wickes' principal place of business.

only "indirectly," "vicariously," or "secondarily" "liable," to the class for the claims pressed in the complaint). Perhaps the best explanation was that given by one noted expert in the field:

[T]he court must determine the citizenship of "the primary defendants" under Sections 1332(d)(3) and (d)(4)(B). There is no statutory definition of the phrase, "the primary defendants," which leaves it to the case law to develop. It is possible to postulate various ways of approaching the issue as a matter of substantive law—e.g., primary vs. secondary liability as statutorily defined; direct vs. vicarious liability at common law; actor vs. conspirator. But it is also possible that the statute is intending to focus on the target defendants in fact— the deep pockets from whom relief is actually available.

Because it is not difficult to define a class as limited to citizens of the forum state (or to maximize their number), the courts' analysis of "the primary defendants"—and "significant" defendants discussed in the next section—will be crucial.

. . . . .

There is the further question whether, or to what extent, "the primary defendants" are distinct from the category of "significant" defendants described in Sections 1332(d)(4)(A)(II)(aa)-(bb). "Significant" defendants are those from whom "significant relief is sought" and whose alleged conduct "forms a significant basis of the claims." Neither of these quoted phrases is defined. Presumably a defendant who is "significant" in the specified ways need not be a "primary defendant," or the drafters would simply have used that phrase again. However, the converse would not appear to be true. A "primary defendant" probably must satisfy one or both of the "significant" criteria—that is, either be a deep pocket or a principal actor. In other words, "significan[ce]" is a prerequisite to "primary" status but is not necessarily sufficient to satisfy it.

Given the fluidity of the undefined phrases characterizing defendants, the plaintiffs' selection of legal theories and defendants is as important as class definition. One could imagine, for example, a plaintiff suing only in-state corporate executives who have insurance and indemnification rights—and suing them only under insurable and indemnifiable theories—in an effort to avoid naming an out-of-state corporation because, if sued, the corporation would be a "primary defendant" and lead to the loss of a state forum.

George P. Joseph, FEDERAL CLASS ACTION JURISDICTION AFTER CAFA, EXXON MOBIL AND GRABLE, 8 Del. L.Rev. 157, 170–71 (2006).

■ A corporation's principal place of business is determined by looking to the state where a "substantial predominance" of the corporate business activity takes place. *Id.* If the corporation's activities do not predominate in any state, then, and only then, does a court look to where the majority of the corporation's executive and administrative functions (often termed the corporation's "nerve center") reside to determine its principal place of business. *See Industrial Tectonics*, 912 F.2d at 1094.

The Ninth Circuit explained the basis for this two-step inquiry as follows:

First, a corporation usually has its greatest contacts with the public where it conducts most of its business, rather than where internal policy decisions are made. Activities such as employment of personnel, purchasing of materials, and sales of goods and services increase local familiarity with the corporation. This local contact alleviates problems with local prejudice against outsiders and justifies consideration of the corporation as a citizen of that state.

Second, suits involving a corporation generally arise from its contacts with the public. Thus, considering a corporation to be a citizen of the state where it has the most public contact and greatest potential for litigation helps reduce the federal court diversity case load, which is a primary goal of the "principal place of business" provision of the diversity statute.

Third, the diversity statute's legislative history indicates that a corporation's principal place of business generally should be where most business operations are carried out rather than where policy making functions are carried out. *Id.*

■ "Substantial predominance" does not require that the majority of a corporation's business activity be located in a single state. *See Tosco Corp. v. Communities for a Better Env't*, 236 F.3d 495, 500 (9th Cir.2001). Instead, all that is required is that "the amount of the corporation's business activity in one state be significantly larger than any other state in which the corporation conducts business." *Id.* The Ninth Circuit has not provided "a map or formula" that would enable a court to precisely identify with any certainty the outer boundaries of when a corporation's activities are "significantly larger" than those in other states. *Ghaderi v. United Airlines, Inc.*, 136 F.Supp.2d 1041, 1047 (N.D.Cal.2001). Rather, such line drawing is left as a "situation specific judgment" for courts to make after "taking into account each of the many pertinent circumstances as they present themselves uniquely in each litigated setting." *Id.*

■ Determining whether a corporation's activities substantially predominate in a particular state, therefore, requires pragmatic consideration of the corporation's day-to-day business dealings that would reflect the importance of a particular activity in the forum state to the corporation's purpose or to its business as a whole. Thus, such factors as "the location of employees, tangible property, and production activities are relevant," as is "the locations where income is earned, purchases are made, and sales take place." *Industrial Tectonics*, 912 F.2d at 1094. In explaining the use of these factors, the Ninth Circuit makes clear that "the principal place of business should be the place where the corporation conducts the most activity that is visible and impacts the public, so that it is least likely to suffer from prejudice against outsiders." *Id.* Because "[a]ctivities such as employment of personnel, purchasing of materials, and sales of goods and services increase local familiarity with the corporation," such local contact "alleviates problems with local

prejudice against outsiders and justifies consideration of the corporation as a citizen of that state." *Id.* Such concern with whether a corporation would be considered an outsider was a fundamental reason for diversity jurisdiction. *See Ghaderi,* 136 F.Supp.2d at 1043 (noting that the "primary purpose of the diversity statute is to avoid prejudice against 'outsiders.' Parties who have a great deal of contact with the public in a particular state are not likely to be considered outsiders and, therefore, are not likely to be victims of discrimination by 'locals' ").

■ Adding a twist to this analysis, Wickes seeks for the Court to look at the factors identified in *Industrial Tectonics* through the lens of a "per capita" quotient. (Defs' Surreply at 7–8). There is a line of decisions fashioned by a few lower courts in the Ninth Circuit that have suggested, that in certain instances, comparing straight percentages of gross numbers is inappropriate "because California has the largest population of any state in the union, [and therefore] it will naturally have more gross sales and more customers than other states." *Albino v. Standard Ins. Co.,* 349 F.Supp.2d 1334, 1338 (C.D.Cal. 2004); *see also Arellano v. Home Depot U.S.A., Inc.,* 245 F.Supp.2d 1102, 1107 (S.D.Cal.2003); *Ho v. Ikon Office Solutions, Inc.,* 143 F.Supp.2d 1163, 1167–68 (N.D.Cal.2001). The Court has some general concerns with using this *per capita* approach across-the-board to all the *Industrial Tectonics* factors in every case.

To begin, the Ninth Circuit in *Industrial Tectonics* itself, as well as in subsequent cases, employs *comparative* percentages (as opposed to *per capita* percentages) of gross numbers (including gross sales) in evaluating whether a corporation's business substantially predominates in one state or another. *See Industrial Tectonics,* 912 F.2d at 1092 (noting that defen-

dant's "California plant accounts for more than 61% of [its] fiscal sales, measured in dollars, and more than 69% of its operating income" as compared to the defendant's Michigan plant); *Tosco,* 236 F.3d at 501–02 (comparing straight percentage difference between defendant's California business operations, including sales and income, to that generated in other states). Thus, whatever salutary benefit such a *per capita* means of examining the pertinent factors may have, it is certainly not one required by Ninth Circuit precedent.

Moreover, those courts that have employed the *per capita* quotient have done so to hold down "the distorting effect of the forum state's size" in those situations where a corporation's activities "is spread relatively evenly" and thinly nationwide. *Arellano,* 245 F.Supp.2d at 1107.

Thus, in *Arellano* the district court employed a *per capita* quotient to determine that Home Depot's business activities did not substantially predominate in one state, and instead looked to where the company's administrative and executive functions were performed to determine its principal place of business. In making this determination, the court noted that Home Depot conducted business in 49 of the 50 states and its activities were spread relatively evenly as a matter of gross percentage in a number of those states (fifteen percent of Home Depot's total workforce was in California, followed by nine percent in Florida, eight percent in Georgia, seven percent in New York, and seven percent in Texas). *Id.* at 1106–1107. Although more of Home Depot's stores and employees were in California, "the margin of difference" as well as the fact that no single state accounted for more than fifteen percent of Home Depot's overall business was found "not significant enough" considering that Home Depot conducts business nationwide. *Id.* In explaining its judgment

that the absolute percentage difference was not significant enough to find that Home Depot's activities substantially predominated in California, the district court noted that the simple fact that California had the largest (but only by a few percentages) share of the company's activities in absolute numbers can be distorting given that "California is the state with the largest population" such that "business activity on a national scale can be expected to be greater in California." *Id.*

In *Ho*, the company conducted business in all 50 states and in no state did its business activity exceed nine percent of its overall business. For instance, 8.6% of the company's employees were in California, compared to 7.4% in Texas, 4.9% in Pennsylvania, 4.9% in New York, and 4.8% in Florida. 143 F.Supp.2d. at 1165. Although California's share of the company's overall business activity exceeded that of every other state, the court held that the corporation's contact was spread so "relatively evenly" across the nation that the simple fact that California accounted for the largest share was insignificant. *Id.* at 1166. Rather, a state's share of a company's overall business must be substantial by itself, not simply in relative comparison to those in other states, for it to be considered the company's principal place of business. The greater the company's presence nationwide, the more substantial that overall percentage must be. It is in this context of a nationwide business that the court thought it important to use *per capita* figures to prevent an absolute percentage difference in a corporation's activities from one state to the next from taking on an unwarranted significance. As explained by the court in *Ho*: "Where, as here, the percentage of the corporation's activities in each of many states is so modest, it is especially important for the court to take into account the distorting effect (on the numbers that reflect relative

activity in the many states) of the forum state's size." *Id.* at 1168.

In no instance has a court used *per capita* figures when a substantial percentage of a corporation's overall business activity occurs in only a couple of states. *See Ho*, 143 F.Supp.2d at 1167 (noting that cases using raw percentages were distinguishable because, in those instances, "the percentage of the corporation's total operations conducted in" each of a few states "was high—between 20[to] 40%"; "stated another way," the states under consideration "each separately contained a relatively large portion of [the corporation's] entire business activity"). Rather, reference to such statistical methodology is reserved for those instances when a company does business relatively evenly and thinly nationwide—meaning in no state did the company's business operations exceed 20% of its total amount of business activity. Here, in contrast, Wickes' business activities are confined to a few states and even then, as explained below, those activities are not spread evenly amongst those states in which it does business but are largely confined to just two states. Given this fact, reference to straight percentage differences between the company's business activities in those states is an appropriate method in gauging where it's business operations substantially predominate.

In this case, Wickes not only presented information concerning its business activities in a *per capita* format, but also as a matter of the gross percentage breakdown of its activities among the states in which it does business.

Wickes conducts its business in five states: California, Oregon, Minnesota, Illinois, and Indiana. The bulk of its business operations, however, are confined to California and Illinois. Thirty-five percent of Wickes' showrooms (12 out of its 34 stores)

are located in Illinois, compared to 38% (or 13 of its 34 stores) in California. Wickes has five distribution centers with each (save for one) handling furniture pieces sold in the state in which the distribution center is located. (Timothy Hilton Decl. ¶ 6). Wickes has two distribution centers in Illinois and one distribution center in California. The significance of this 2–to–1 ratio is diminished when one considers that the combined square footage of the distribution centers in Illinois (616,982 sq. ft.) is only 43,982 more than that in California (573,000 sq. ft.). Moreover, one of the Illinois distribution centers handles furniture pieces not only for Wickes' showrooms in Illinois, but also for those in Indiana, thereby overinflating the number of pieces Wickes actually distributed in Illinois (a fact which is reflected below in the gross sales and revenue numbers), as well as the combined square footage of the distribution centers in Illinois given that a portion of those facilities were devoted to out-of-state operations. Even with these additional considerations, the slightly smaller California distribution center still handled 117,379 *more* pieces of furniture than the two centers in Illinois. Indeed, the California distribution center handled nearly 45% (679,716 pieces out of 1,517,815 pieces total) of all the furniture processed by all of Wickes' distribution centers during the year 2005, while the two distribution centers in Illinois (562,337 pieces out of 1,517,815 pieces total) combined accounted for 37%. This disparity in the number of pieces handled by the California distribution center translated into the amount of furniture pieces Wickes sold and the gross revenues Wickes generated during the year 2005, with 45% of its overall sales (679,716 pieces out of 1,517,815 total) and 46% of its revenues occurring in California and only 33% of its sales (498,-425 pieces out of 1,517,815 total) and 32% of its revenues occurring in Illinois.

California's gravitational pull on Wickes' business activity is also reflected in the size of its showroom facilities, which are composed of "retail space, warehouse space, and office space." (Defs' Summ. Evid. at 5). The Illinois showroom facilities total 778,936 square feet, or 35% of Wickes' total showroom facility capacity (2,193,890 sq. ft.), while that in California totals 992,384 square feet, more than two hundred thousand more square feet of showroom facility space than that in Illinois and comprising 45% of Wickes' overall showroom facility capacity.

Insofar as the location of its company personnel, 48% of Wickes' employees (663 out of 1382 total employees) are located in California, with only 34% (or 465 out of 1382 total employees) in Illinois. Such a disparity between the number of physical plants/stores and number of employees strongly suggests (and indeed is confirmed by the numbers noted above) that, while Illinois and California may be roughly equivalent in number of stores, the scope and the size of Wickes' operations in California is significantly larger than in Illinois.

Finally, Wickes corporate headquarters is located primarily in Illinois. All but one of Wickes' corporate officers reside in Illinois; the one exception being the vice-president for Wickes' West Region who resides in California.

These numbers are not that unlike those in *Ghaderi v. United Airlines, Inc.*, 136 F.Supp.2d 1041 (N.D.Cal.2001). There, United Airlines' business was largely confined to California and Illinois. It employed 31.6% of its workforce in California and 23% in Illinois; 41% of the company's revenue was derived in California and 30% in Illinois; 24% of its airline passengers departed from one of the company's terminals in California and 18% from Illinois;

and 29% of the cargo moved by United was either shipped to, from, or through California and only 20% in Illinois. *Id.* at 1045-46. The *Ghaderi* court concluded that the difference between the two states was sufficient to conclude that a substantial predominance of United Airlines' business activities lied in California. As explained by the court, when a company's business activities are confined to a couple of states, with each containing a large percentage of overall business activity, the "difference between the magnitude of activity in the two states need not be very large to be considered 'substantial.'" *Id.* at 1047.

As in *Ghaderi*, a large percentage of Wickes' business activities are confined to two states and, also as in *Ghaderi*, a larger share of that percentage is conducted in California. The differences in percentages are also significant. Nearly half of Wickes' employees and its sales take place in California, while roughly a third of the same are in Illinois. Such a high percentage in California is all the more significant given that these particular forms of activity are the most public ones conducted by a business and hence the ones most likely to familiarize Wickes in the eyes of a jury as being a local business concern. As explained in *Ghaderi*, "One of [the] goals is to determine in which state [a company] had the most public contact and the greatest potential for litigation. We strongly suspect that angry customers and angry employees are sources of a majority of litigation that corporate parties face" and the one making the company "more well known" by locals in that jurisdiction. *Id.* at 1045.

Accordingly, the Court finds that a substantial predominace of Wickes' business activities occur in California and therefore its principal place of business is in this state. Given that Wickes is a citizen of California, the local controversy rule applies. Plaintiffs' motion to remand is **GRANTED** and this matter is remanded to the San Bernardino County Superior Court.

IT IS SO ORDERED.