**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NORTHWEST ENVIRONMENTAL
DEFENSE CENTER, PUBLIC
EMPLOYEES FOR ENVIRONMENTAL
RESPONSIBILITY; NORTHWEST
SPORTFISHING INDUSTRY
ASSOCIATION,
                    *Petitioners,*

NORTHWEST POWER AND
CONSERVATION COUNCIL,
                    *Intervenor,*

          v.

BONNEVILLE POWER
ADMINISTRATION,
                    *Respondent.*

No. 06-70430

CONFEDERATED TRIBES AND
BANDS OF THE YAKAMA INDIAN
NATION,
                    *Petitioner,*

          v.

BONNEVILLE POWER
ADMINISTRATION,
                    *Respondent.*

No. 06-71182

OPINION

On Petition for Review of a Final Action of the
Bonneville Power Administration

Argued and Submitted
September 12, 2006—Portland, Oregon

939

Filed January 24, 2007

Before: Michael Daly Hawkins, Barry G. Silverman, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

**COUNSEL**

Stephanie M. Parent, Pacific Environmental Advocacy Center, Portland, Oregon, for petitioners Northwest Environmen-

tal Defense Center, Public Employees for Environmental Responsibility, and Northwest Sportfishing Industry Association.

Tim Weaver, Law Office of Tim Weaver, Yakima, Washington, for petitioner Confederated Tribes and Bands of the Yakama Nation.

David J. Adler, Special Assistant United States Attorney and Stephen J. Odell, Assistant United States Attorney, Portland, Oregon, for respondent Bonneville Power Administration.

John Shurts, Northwest Power and Conservation Council, Portland, Oregon, for intervenor Northwest Power and Conservation Council.

David J. Cummings, Nez Perce Tribe Office of Legal Counsel, Lapwai, Idaho, for amicus Nez Perce Tribe.

Howard G. Arnett, Karnopp Petersen, LLP, Bend, Oregon, for amicus Confederated Tribes of the Warm Springs Reservation of Oregon.

Christopher B. Leahy, Fredericks, Pelcyger & Hester, LLC, Louisville, Colorado, for amicus Confederated Tribes of the Umatilla Reservation.

## OPINION

GOULD, Circuit Judge:

Salmon and steelhead[1] are two of the great natural

---

[1]A steelhead is a rainbow trout which has spent part of its life at sea. Alaska Dep't of Fish & Game, *Steelhead Trout*, http://www.adfg.state.ak.us/pubs/notebook/fish/steelhd.php (last visited Jan. 17, 2007).

resources of the Columbia River. Their continued existence has been threatened by the construction of dams to capture a third great natural resource of the Columbia River, its water power. As these dams were constructed, the number of salmon and steelhead migrating up the Columbia River to reproduce at its headwaters dropped. At one time, an estimated ten to sixteen million adult fish returned to the Columbia River basin each year. Today, only about one million fish return for spawning that is essential to the species' survival in the Columbia River system.

In response to declining salmon and steelhead runs, Congress passed the Northwest Power Planning and Conservation Act of 1980. The Act created the Northwest Power and Conservation Council, an interstate compact agency, and directs the Council to prepare programs to protect and enhance the fish and wildlife of the Columbia River basin while also assuring the Pacific Northwest an adequate, efficient, economical, and reliable power supply. The Act also instructs the Bonneville Power Administration, the federal agency that operates the dams on the Columbia River, to use its authority in a manner consistent with the programs developed by the Council.

In 1982, the Council called for the creation of what would eventually become the Fish Passage Center. The Fish Passage Center provides technical assistance and information to fish and wildlife agencies, Indian tribes, and the general public on matters related to juvenile and adult salmon and steelhead passage through the Columbia River and its tributaries. Since 1987, the Bonneville Power Administration has funded the Fish Passage Center, and the Fish Passage Center has gathered, analyzed, and publicly-disseminated data regarding fish passage. The Bonneville Power Administration has used this information, in consultation with fisheries and Indian tribes and in conjunction with its control over water flow past the dams, to help improve the survival rates of fish migrating up and down the Columbia River.

In light of language in two 2005 congressional committee reports, however, the Bonneville Power Administration decided to transfer the functions performed by the Fish Passage Center to Battelle Pacific Northwest Laboratory and Pacific States Marine Fisheries Commission. In this consolidated case, Northwest Environmental Defense Center, Public Employees for Environmental Responsibility, Northwest Sportsfishing Industry Association, and the Confederated Tribes and Bands of the Yakama Nation (collectively, "petitioners") petition for review of the Bonneville Power Administration's action transferring the functions of the Fish Passage Center to Battelle Pacific Northwest Laboratory and Pacific States Marine Fisheries Commission and creating a new model Fish Passage Center ("new model").

I

A

Created by the Bonneville Project Act of 1937, 16 U.S.C. §§ 832-832m, the Bonneville Power Administration ("BPA") is a federal agency within the Department of Energy. BPA sells and transmits wholesale electricity from thirty-one federal hydroelectric plants, one non-federal nuclear power plant in Hanford, Washington, and other non-federal power plants in the Columbia River basin. About BPA Home, http://www.bpa.gov/corporate/About_BPA/ (last visited Jan. 17, 2007). BPA's customers include federal agencies, public and private utility companies, and direct service industrial customers. *See Kaiser Aluminum & Chem. Corp. v. BPA*, 261 F.3d 843, 845 (9th Cir. 2001). BPA does not receive annual appropriations, as is the case with most federal agencies. Rather, the revenue that BPA obtains from its sales and transmission of electricity is deposited in the Bonneville Power Administration fund ("BPA fund"). 16 U.S.C. § 838i(a). BPA then uses the fund to finance its operations. *Id.* § 838i(b).

As a self-financing power marketing agency, BPA must set its prices high enough to cover its costs. *Indus. Customers of*

*Nw. Utilities v. BPA*, 408 F.3d 638, 641 (9th Cir. 2005); *Ass'n of Public Agency Customers, Inc. v. BPA*, 126 F.3d 1158, 1164 (9th Cir. 1997) [hereinafter *APAC*]. BPA must also sell power to consumers "at the lowest possible rates." 16 U.S.C. § 838g. At the same time, BPA must be environmentally conscious, supporting energy conservation and protecting the fish and wildlife of the Columbia River basin. *APAC*, 126 F.3d at 1164; *see, e.g.*, 16 U.S.C. § 839b(h)(10)-(11) (providing that BPA must use the BPA fund and its statutory authority in a manner that protects and enhances fish and wildlife).

In 1980, to assist BPA in balancing its responsibilities to provide low-cost energy while protecting fish and wildlife, Congress passed the Pacific Northwest Power Planning and Conservation Act ("Northwest Power Act" or "Act"), Pub. L. No. 96-501, 94 Stat. 2697 (1980) (codified at 16 U.S.C. §§ 839-839h). The Act authorized state governments to form what is now called the Northwest Power and Conservation Council ("Council"), an interstate compact agency[2] comprised of members from Idaho, Montana, Oregon, and Washington. 16 U.S.C. § 839b(a)(2)(B); *see Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conservation Council*, 786 F.2d 1359, 1366 (9th Cir. 1986) (upholding the constitutionality of the Council). Each state has agreed to participate in the Council, *see* Idaho Code § 61-1201; Mont. Code Ann. § 90-4-401; Or. Rev. Stat. § 469.803; Wash. Rev. Code Ann. § 43.52A.010, and has enacted legislation authorizing its governor to appoint two members to the Council, *see* Idaho Code § 61-1202; Mont. Code Ann. § 90-4-402; Or. Rev. Stat. § 469.805; Wash. Rev. Code Ann. § 43.52A.030.

---

[2]For a landmark discussion of the use of the Compact Clause, article I, section 10, clause 3 of the Constitution, to permit agreements by states on a regional basis, including the need to do so to promote sound development of electrical power and conservation of natural resources, see Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution—A Study In Interstate Adjustments*, 34 Yale L.J. 685 (1925).

The Act charges the Council with two tasks fundamental to this case: (1) preparing and periodically reviewing a regional conservation and electric power plan to aid BPA in acquiring and developing power resources ("Power Plan" or "Plan") and (2) preparing and periodically reviewing a program to protect, mitigate, and enhance fish and wildlife ("Fish and Wildlife Program" or "Program"). 16 U.S.C. § 839b(a)(1).

The current composition of the Council reflects the varied constituencies it serves. The Council is chaired by an expert in natural resource economics. Many Council members are former business persons or practicing attorneys. Indian tribes and fishing enthusiasts are also represented on the Council. Four of the eight current Council members have served as state senators or state representatives in the Pacific Northwest.[3]

The Council submits each project proposed for funding under its Fish and Wildlife Program for review by the Independent Scientific Review Panel, an eleven-member panel of independent scientists appointed by the Council from the recommendations of the National Academy of Scientists. *See id.* § 839b(h)(10)(D). The Act obliges BPA to consult with state fish and wildlife agencies and Indian tribes in carrying out its responsibilities under the Act. *See id.* § 839b(h)(11)(B). In short, the Act "establishes an innovative system of cooperative federalism under which the states, within limits provided in the Act, can represent their shared interests in the maintenance and development of a power supply in the Pacific Northwest and in related environmental concerns." *Seattle Master Builders*, 786 F.2d at 1366.

B

Section 839b(h)(10)(A) of the Act explains how the views of the Council guide BPA's actions. It provides:

---

[3]For biographical information on the Council's current members, see Council Members, http://www.nwcouncil.org/contact/members.asp (last visited Jan. 17, 2007).

> The Administrator [of BPA] shall use the Bonneville Power Administration fund and the authorities available to the Administrator under this chapter and other laws administered by the Administrator to protect, mitigate, and enhance fish and wildlife to the extent affected by the development and operation of any hydroelectric project of the Columbia River and its tributaries in a manner consistent with the plan, if in existence, the program adopted by the Council under this subsection, and the purposes of this chapter.

16 U.S.C. § 839b(h)(10)(A). In other words, the Act requires BPA's fish and wildlife protection, mitigation, and enhancement actions to be consistent with (1) the Council's Power Plan; (2) the Council's Fish and Wildlife Program; and (3) the purposes of the Act.[4] Section 839b(h)(10)(A) is thus referred to as the Act's "consistency requirement."

The Council adopted its first Fish and Wildlife Program in 1982. Since 1982, the Council has reviewed and reformulated its Program five times. The current version of the Program was adopted in 2000 ("2000 Program") and amended in 2003 by the Mainstem Amendments ("2003 Amendments").

---

[4] In 16 U.S.C. § 839, Congress listed the purposes of the Act: (1) to encourage electricity conservation and the development of renewable resources in the Pacific Northwest; (2) "to assure the Pacific Northwest of an adequate, efficient, economical, and reliable power supply"; (3) to allow the States, local governments, and citizens of the Pacific Northwest (including fish and wildlife agencies and Indian tribes) to participate in the development of regional energy conservation plans, plans for renewable resources, and plans for environmental protection and enhancement; (4) to ensure that BPA's customers cover the costs necessary to meet the region's electricity needs; (5) to ensure that non-federal entities continue to regulate, plan, conserve, supply, and distribute electricity; and (6) "to protect, mitigate and enhance the fish and wildlife . . . of the Columbia River and its tributaries."

In preparing the 2000 Program, the Council consulted with the Pacific Northwest's fish and wildlife agencies, Indian tribes, and other interested members of the public, as required by the Act. *See id.* § 839b(g). After considering these parties' recommendations, the Council prepared a draft Program and conducted a public comment period before preparing the final version of the 2000 Program. The Program "expresses goals and objectives for the entire [Columbia River] basin based on a scientific foundation of ecological principles." Nw. Power & Conservation Council, *Columbia River Basin Fish and Wildlife Program* 9 (2000) [hereinafter 2000 Program], *available at* http://www.nwcouncil.org/library/2000/2000-19/FullReport.pdf. These objectives apply to all fish and wildlife projects implemented in the basin. *Id.* The objectives crucial to this case include mitigating the adverse effects to salmon and steelhead caused by the Columbia River's hydropower system and ensuring sufficient populations of salmon and steelhead for both Indian tribal-trust and treaty-right fishing and non-tribal fishing. *Id.* at 16. A goal of the Program is to increase total adult salmon and steelhead runs on the Columbia River from about one million annually today to an average of five million annually by 2025. *Id.* at 7, 17.

C

The Fish Passage Center ("FPC") has been a part of the Council's Fish and Wildlife Program since 1982. Originally called the Water Budget Center, it consisted of two managers who oversaw the annual water budget the Council adopted as part of the Program. The water budget provided for additional releases of water from federal dams each spring to facilitate the migration of juvenile salmon and steelhead to the Pacific Ocean. The Water Budget Center's two managers recommended to federal agencies how they could use the water budget to improve the survival rate of fish passing through the dams during their downstream migration. *See Pub. Utility Dist. No. 1 v. BPA*, 947 F.2d 386, 389 (9th Cir. 1991) (dis-

cussing FPC's oversight of the annual water budget contained in the 1987 Program).

The FPC's responsibilities under the Program have expanded considerably since its days as the Water Budget Center. The Council's 1987 Program provided that BPA "shall fund the establishment and operation of a Fish Passage Center." The Council envisioned that the FPC would assist the dams' fish passage managers in planning and implementing a smolt[5] monitoring program, developing and implementing flow and spill requests, and monitoring and analyzing research results to assist in implementing the water budget and spill planning.

The Council's 2000 Program "continues the operation of the Fish Passage Center." 2000 Program, *supra*, at 28. The 2003 Amendments to the Program elaborate on the Council's vision of the FPC's role, stating that "[t]he mainstem plan calls for the continued operation of the Fish Passage Center," and listing specific tasks the Council expects the FPC to perform in helping implement the water management measures in the Council's Fish and Wildlife Program. Nw. Power & Conservation Council, *Mainstem Amendments to the Columbia River Basin Fish and Wildlife Program* 27 (2003) [hereinafter 2003 Amendments], *available at* http://www.nwcouncil.org/library/2003/2003-11.pdf.

The 2003 Amendments provide that "[t]he primary purpose of the [FPC] is to provide technical assistance and information to fish and wildlife agencies and [Indian] tribes in particular, and the public in general, on matters related to juvenile and adult salmon and steelhead passage through the mainstem hydrosystem." *Id.* The 2003 Amendments require the FPC to (1) plan and implement a smolt monitoring program; (2)

---

[5]A smolt is a juvenile salmon in the stage where it becomes covered with silvery scales and first embarks on its journey to salt water. *See* John V. Byrne, *Salmon Is King—Or Is It?*, 16 Envtl. L. 343, 352-53 (1986).

gather, organize, analyze, store, and make widely-available monitoring and research information about fish passage and the implementation of water management and fish passage measures contained in the Council's Program; (3) provide technical information to assist fish and wildlife agencies and Indian tribes requesting the federal dams to spill water; and (4) provide technical assistance to ensure the recommendations for river operations avoid conflicts between anadromous[6] and resident fish. *Id.* at 27-28.

To carry out these responsibilities, the FPC monitors more than twenty dams and fish traps; collects data on chinook, steelhead, coho, shad, sockeye, pink salmon, and lamprey; and monitors river conditions, including temperature, dissolved gases, fish hatchery releases, and dam flows and spills. The FPC makes information it gathers available on its website. Fishery managers and Indian tribes use this information to make flow and spill requests to BPA and the operators of the dams, who, by controlling the water flow past the dams, can improve the survival rates of fish migrating downstream.[7]

---

[6]An anadromous fish lives in the sea but breeds in freshwater. *See* 50 C.F.R. § 401.2(g) (defining anadromous fish as "[a]quatic, gill breathing, vertebrate animals bearing paired fins which migrate to and spawn in fresh water, but which spend part of their life in an oceanic environment"); *see also* Convention for the Conservation of Anadromous Stocks of the North Pacific Ocean, art. II.1, annex pt. I, Feb. 11, 1992, T.I.A.S. No. 11,465 (classifying the following species as anadromous fish: chum salmon, coho salmon, pink salmon, sockeye salmon, chinook salmon, cherry salmon, and steelhead trout); 16 U.S.C. §§ 5001-12 (implementing the Convention).

[7]Fish migrating down the stream of a dammed river encounter a series of dangers. The fish must navigate the reservoir of standing water maintained behind the dam. The standing water slows the migration of the fish and exposes the fish to predators. After navigating the reservoir, the fish must then pass the dam safely. Fish may pass a dam by being spilled over the dam, by passing through the turbines of the dam, or by being transported around the dam. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 788-89 (9th Cir. 2005). The data gathered by the FPC is used to measure the success that fish have passing dams.

From the administrative record it appears that the FPC operates independently of BPA and the Council. However, nothing in the record indicates that the FPC is a distinct legal entity. BPA funds the FPC through grants administered by master contracts with the Pacific States Marine Fisheries Commission ("Pacific States"). BPA specifies tasks for the FPC to perform in annual statements of work within BPA's master contract with Pacific States.

D

Conflict between environmental and energy interests in the Columbia River basin has on occasion played out in the court-room, as shown in BPA-related cases decided by us. *See, e.g.*, *Confederated Tribes of the Umatilla Indian Reservation v. BPA*, 342 F.3d 924 (9th Cir. 2003); *Nw. Envtl. Def. Ctr. v. BPA*, 117 F.3d 1520 (9th Cir. 1997); *Nw. Res. Info. Ctr., Inc. v. Nw. Power Planning Council*, 35 F.3d 1371 (9th Cir. 1994) [hereinafter, *NRIC*]; *Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 25 F.3d 872 (9th Cir. 1994). In this case, however, an issue over how to balance fish survival and recovery with the inexpensive production of hydropower was raised in the legislative committee process.

In June 2005, the United States Senate Appropriations Sub-committee on Energy and Water Development issued its report on House Resolution 2419, the resolution that would become the Energy and Water Development Appropriations Act of 2006 ("2006 Appropriations Act"). The subcommittee report stated that BPA "may make no new obligations from the Bonneville Power Administration Fund in support of the Fish Passage Center" because "there are universities in the Pacific Northwest that already collect fish data for the region" and can carry out the FPC's responsibilities "at a savings to the region's ratepayers." S. Rep. No. 109-84, at 179 (2005).

On November 19, 2005, Congress passed the 2006 Appropriations Act. Pub. L. No. 109-103, 119 Stat. 2247 (2005).

The 2006 Appropriations Act makes no reference to the FPC. The Conference Committee Report of the Congress accompanying the Act, however, states that

> The Bonneville Power Administration may make no new obligations in support of the Fish Passage Center. The conferees call upon Bonneville Power Administration and the Northwest Power and Conservation Council to ensure that an orderly transfer of the Fish Passage Center functions (warehouse of smolt monitoring data, routine data analysis and reporting and coordination of the smolt monitoring program) occurs within 120 days of enactment of this legislation. These functions shall be transferred to other existing and capable entities in the region in a manner that ensures seamless continuity of activities.

H.R. Rep. No. 109-275, at 174 (2005) (Conf. Rep.).

On December 8, 2005, in response to the committee reports, BPA issued a "Program Solicitation for Key Functions previously performed by the Fish Passage Center" ("Program Solicitation"). The Program Solicitation states that "[i]n November 2005, the US Congress passed legislation (House Report 109-275), which forbids BPA from making additional obligations in support of the Fish Passage Center." The Program Solicitation further states that "BPA has decided to implement this requirement thru [sic] the issuance of this Program Solicitation."

BPA received five responses to its Program Solicitation. On January 26, 2006, BPA announced, in a press release, its decision to award contracts for the functions formerly performed by the FPC to Battelle Pacific Northwest National Laboratory ("Battelle") and Pacific States.[8] The new model

---

[8] Pacific States is the entity that now contracts with BPA to receive the grants that Pacific States in turn uses to fund the operations of the FPC. *See supra* at 952.

divides between Battelle and Pacific States a number of the functions that had been wholly the responsibility of the FPC. According to the press release, under this new model, Pacific States will "coordinate implementation of the Smolt Monitoring Program, manage the real-time database of the monitoring program and related data, and perform routine analysis and reporting of that data." On the other hand, Battelle will "serve a coordinating function, relying on experts in the field to provide in-depth analysis of the data." Battelle executed its contract with BPA on February 28, 2006, and Pacific States executed its contract on March 16, 2006.

E

Northwest Environmental Defense Center, Public Employees for Environmental Responsibility, and Northwest Sportsfishing Industry Association (collectively, "NEDC") filed a petition for review with us on January 23, 2006 and an amended petition for review on February 6, 2006, challenging BPA's decision to transfer the functions of the FPC to Pacific States and Battelle, alleging that the transfer of the functions of the FPC ran afoul of BPA's duties under the Northwest Power Act. The Confederated Tribes and Bands of the Yakama Nation ("Yakama") filed a petition for review on March 3, 2006, also challenging BPA's decision to transfer the functions of the FPC.

On March 17, 2006, we granted the petitioners' request for a stay pending our review of BPA's action. We ordered BPA to "continue, pending resolution of [the petition for review] and/or further order of the court, its existing contractual arrangement to fund and support the Fish Passage Center under the existing terms and conditions." On April 7, 2006, we consolidated NEDC's petition with the petition filed by Yakama.

The petitioners ask us to set aside BPA's decision to transfer the functions of the FPC and to use our equitable authority

to order BPA to fund the FPC. Before we address the merits of their petitions for review, we must determine whether we have jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

## II

BPA raises two challenges to our jurisdiction. First, BPA argues that we lack statutory jurisdiction to adjudicate the petitioners' challenge to BPA's decision to transfer the functions of the FPC because BPA's December 8, 2005 Program Solicitation is not a "final action" of BPA. *See* 16 U.S.C. § 839f(e)(5) (permitting judicial review of "final actions" of BPA and the Council). Second, BPA asserts that the petitioners do not have standing to challenge BPA's action in this case because a decision in favor of the petitioners will not be likely to redress the petitioners' injury, as required for us to exercise jurisdiction under Article III of the United States Constitution. We consider these challenges to our subject-matter jurisdiction de novo. *Indus. Customers of Nw. Utils.*, 408 F.3d at 644.

## A

[1] The Northwest Power Act vests us with original and exclusive subject-matter jurisdiction over challenges to "final actions and decisions taken pursuant to [the Act] by the Administrator [of BPA] or the Council, or the implementation of such final actions." 16 U.S.C. § 839f(e)(5). We have interpreted § 839f(e)(5)'s judicial review provision "with a broad view of this Court's jurisdiction." *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 925 (9th Cir. 2002) (internal quotation omitted).

[2] BPA argues that we lack jurisdiction over the petitioners' challenge to the December 8, 2005 Program Solicitation because the Program Solicitation was not a "final action." But in its brief BPA concedes that its January 26, 2006 decision,

selecting the successors to the FPC, is a final agency action subject to judicial review under § 839f(e)(5). While BPA's issuance of the Program Solicitation alone might not have been a final action subject to our review, BPA's initial decision to create a new model Fish Passage Center and to issue the Program Solicitation was part of the process BPA used to set its course, leading to what BPA concedes was its final action transferring the functions of the FPC to Pacific States and Battelle. Because both NEDC's and Yakama's petitions for review directly challenge the January 26, 2006 final action, and BPA's December 8, 2005 action was simply a part of the process that led to BPA's final action, we have statutory jurisdiction over both NEDC's and Yakama's petitions for review.

B

BPA next argues that we lack Article III jurisdiction over these petitions for review. To have constitutional standing to challenge BPA's action, the petitioners must satisfy a familiar three-part test established by the Supreme Court. First, the petitioners must have suffered an "injury in fact" which is (a) concrete and particularized and (b) actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Second, the petitioners must show a causal connection between the injury and the conduct complained of. *Id.* Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotations omitted). BPA argues that the petitioners have failed to satisfy the final element of the test, claiming that the remedy that the petitioners seek is beyond our authority.

The petitioners ask that we set aside BPA's final action transferring the functions of the FPC to Pacific States and Battelle and order BPA to continue the FPC's funding until it can reconsider, in accordance with any opinion of this court, its decision to transfer the functions of the FPC. BPA contends that we have no authority to order BPA to fund the FPC,

making it impossible for us to redress any injury suffered by the petitioners and leaving the petitioners without standing. BPA points out that it funded the FPC through an annual grant that expired and was renewed every year. BPA argues that to order it to continue to fund the FPC requires us to force BPA to contract against its will, an action beyond the authority of the judiciary.

[3] The cases BPA relies on are cases stating the unremarkable proposition of contract law that a court will not create new obligations that do not exist within the four corners of a contract. *See Imperial Fire Ins. Co. of London v. Coos County*, 151 U.S. 452, 462 (1894) (rejecting jury instructions contrary to the unambiguous language of an insurance policy); *City of New Orleans v. New Orleans Waterworks Co.*, 142 U.S. 79, 91 (1891) (refusing to construe a decision of the Louisiana Supreme Court as creating a new contract between the parties); *Jaeger v. Canadian Bank of Commerce*, 327 F.2d 743, 745 (9th Cir. 1964) (stating that courts have no power to make new contracts); *Peterson v. Noots*, 255 F. 875, 880 (9th Cir. 1919) (refusing to read additional provision into a liquidated damages clause where the liquidated damages clause was unambiguous). In a contract case between two private parties, our remedial power is no doubt limited to enforcing the obligations to which the private parties agreed. *See* 25 Richard A. Lord, *Williston on Contracts* § 67:30 (4th ed. 2006) (stating that a court, in granting equitable relief "is curtailed to the extent that it must generally act within the framework of the contract").

[4] This case presents a different situation. Rather than asking us to remedy a violation of private law (e.g., a breach of contract), the petitioners ask us to remedy the violation of a public law—the Administrative Procedure Act ("APA")[9]—by

---

[9]Public law is the body of law regulating relations between private parties and the government and regulating the structure and operation of the government itself. *See Black's Law Dictionary* 1267 (8th ed. 2004). Public law consists of the fields of constitutional law, criminal law, and administrative law. *Id.*

contending that BPA acted arbitrarily, capriciously, and contrary to law in transferring the functions of the FPC. *See* 5 U.S.C. § 706(2)(A); *see also* 16 U.S.C. § 839(f)(e)(2) (directing that courts review final actions of BPA under the APA). When a public law has been violated, we are not bound to stay within the terms of a private agreement negotiated by the parties, and may exercise our equitable powers to ensure compliance with the law. *See Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) ("The court's decision to grant or deny injunctive or declaratory relief under [the] APA is controlled by principles of equity.").

Moreover, "[w]here the public interest is involved, 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.' " *United States v. Alisal Water Corp.*, 431 F.3d 643, 654 (9th Cir. 2005) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)). Unless Congress provides otherwise, " '[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.' " *United States v. Coca-Cola Bottling Co. of L.A.*, 575 F.2d 222, 228 (9th Cir. 1978) (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 383 (1965)).

For example, in *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1109 (9th Cir. 1982), the FTC sought a permanent injunction under the Federal Trade Commission Act. In comparing the scope of the equitable powers of federal courts in private law matters versus public law matters, we wrote:

> "Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of [its] jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at

stake. Power is thereby resident in the District Court, in exercising [its] jurisdiction, to do equity and to mould each decree to the necessities of the particular case."

*Id.* at 1112 (quoting *Porter*, 328 U.S. at 398) (citation and internal quotation omitted). We concluded that, in the absence of congressional directive, federal courts retain broad equitable powers in public law matters, including the "authority to grant any ancillary relief necessary to accomplish complete justice." *Id.* at 1113. We thus affirmed the district court's injunction freezing the assets of certain defendants. *Id.*

**[5]** Section 706(2) of the APA gives us the equitable power to "set aside" BPA's action transferring the functions of the FPC, if we determine that BPA's action was arbitrary, capricious, or contrary to law. *See* 5 U.S.C. § 706(2)(A); *Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. U.S. Dep't of Energy*, 232 F.3d 1300, 1305 (9th Cir. 2000) (holding that, under the APA, a court has authority to order recision of a contract for sale if the federal agency "acted in excess of statutory authority or without observance of the procedures required by law"). As shown by our prior order mandating that BPA continue to fund the FPC until we rule on the merits of the petitions for review, this court, as a court of equity conducting judicial review under the APA, has broad powers to order "mandatory affirmative relief,"[10] *Adams v. Witmer*, 271 F.2d 29, 38 (9th Cir. 1958), if such relief is "necessary to accomplish complete justice," *H.N. Singer, Inc.*, 668

---

[10]In *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004), the Supreme Court held that, when a party seeks redress because an agency has failed to act, a court may only require the agency to perform non-discretionary actions that the agency is required by law to undertake. *Norton* is distinguishable from the instant case because *Norton* dealt with the power of courts to "compel agency action unlawfully withheld" under 5 U.S.C. § 706(1). The petitioners here do not seek redress for agency inaction under § 706(1), but rather challenge a final agency action under the § 706(2) and the Northwest Power Act.

F.2d at 1113. Stated another way, if we conclude that BPA violated the APA by acting arbitrarily, capriciously, or contrary to law, we have the ability and indeed the juristic duty to remedy BPA's violation. Viewed in this light, we are confident that we retain the power to require BPA to fund the FPC, at least for a period of time in which BPA can reconsider its action in accordance with our opinion. Because we have the power to redress the injury suffered by the petitioners if they prevail on their legal theory, we hold that, under *Lujan*, the petitioners have standing to pursue their petitions for review.

## III

As we discussed above, the Northwest Power Act dictates that our review of BPA's final agency action is governed by § 706 of the APA, 5 U.S.C. § 706. 16 U.S.C. § 839f(e)(2). Under the APA, we must set aside BPA's action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see NRIC*, 35 F.3d at 1383. The petitioners contend that BPA violated the APA in two ways. First, the petitioners contend that BPA acted "not in accordance with law" by transferring the functions of the FPC based on its belief that language in a committee report had a binding legal effect on the agency. Second, the petitioners argue that BPA acted arbitrarily and capriciously because it did not employ a rational decision-making process in deciding to transfer the functions of the FPC to Pacific States and Battelle. We address those arguments in turn.

## A

The petitioners first contend that BPA's decision to transfer the functions of the FPC was "not in accordance with law," 5 U.S.C. § 706(2), because BPA gave legally-binding effect to a passage of legislative history. BPA counters by asserting that it engaged in the rational decision-making process that the APA requires by observing the language contained in the

congressional committee reports regarding the 2006 Appropriations Act and implementing the directives in the reports.

1

Though the text of the 2006 Appropriations Act itself made no reference to the FPC, its accompanying conference committee report stated that "[t]he Bonneville Power Administration may make no new obligations in support of the Fish Passage Center." H.R. Rep. No. 109-275, at 174 (2005) (Conf. Rep.). The committee report language also instructed BPA and the Council "to ensure an orderly transfer of the Fish Passage Center functions . . . within 120 days of enactment of this legislation." *Id.* The report issued by the Senate Appropriations Subcommittee on Energy and Water Development on House Resolution 2419, the resolution that would become the 2006 Appropriations Act, contained similar language, indicating that BPA "may make no new obligations from the Bonneville Power Administration Fund in support of the Fish Passage Center." S. Rep. No. 109-84, at 179 (2005).

It is an understatement to say that BPA gave great weight to these reports; more accurate is the observation that BPA slavishly deferred to what it thought the reports commanded. As one example, BPA's Program Solicitation states that "[i]n November 2005, the US Congress passed legislation (House Report 109-275), which forbids BPA from making additional obligations in support of the Fish Passage Center." A September 20, 2005 email written by a Vice President of BPA, Gregory K. Delwiche, also reflects BPA's view of the importance of the Senate subcommittee report. Michelle DeHart, Manager of the FPC, had asked Delwiche his thoughts on the future of the FPC. After Delwiche responded that he would have to wait and see "how this is playing out in our nation's capitol [sic]," DeHart replied, "I was really not thinking about talking about the language [in the subcommittee report] but in getting an idea from you as to what your thinking was on the Fish Passage Center in the future." Delwiche responded:

"[T]he reason the language is important is that what my thinking is on the Fish Passage Center really isn't relevant, what's relevant is what the direction from Wash DC [sic] is. We are merely the implementer of guidance from back there."

Delwiche again indicated his belief that BPA had no choice but to follow the committee report language in a declaration filed in our court, characterizing the language in the committee reports as "unambiguous Congressional direction." Delwiche explained BPA's decision to transfer the FPC by stating that "I did not think that, as an Executive Branch agency, accountable to Congress, BPA could ignore this unambiguous Congressional direction." Finally, in BPA's brief, BPA states that it interpreted the conference committee report as "the unambiguously expressed will of the Congress."

In summary, BPA treated the committee report language as if the language placed a legal obligation on BPA to transfer the functions of the FPC. However, as we explain in the next section, committee report language unconnected to the text of an enacted statute has no binding legal import, and it was contrary to law for BPA to base its decision to transfer the FPC on its belief that "the US Congress passed legislation (House Report 109-275) . . . forbid[ding] BPA from making additional obligations in support of the Fish Passage Center."

2

The APA empowers us to set aside an agency decision that is contrary to governing law. 5 U.S.C. § 706(2); *see Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005). The case law of the Supreme Court and our court establishes that legislative history, untethered to text in an enacted statute, has no compulsive legal effect. It was thus contrary to law for BPA to conclude, from committee report language alone, that it was bound to transfer the functions of the FPC.

In *Shannon v. United States*, 512 U.S. 573, 579 (1994), the petitioner, a criminal defendant, argued that the district court

erred by failing to instruct the jury about the consequences of finding him not guilty by reason of insanity. The petitioner argued that Congress, in enacting the Insanity Defense Reform Act of 1984 ("IDRA"), intended to require that district courts instruct the jury as to the consequences of an insanity acquittal. *Id.* at 583. The text of IDRA was silent on the matter. *Id.* at 580; *see* 18 U.S.C. § 4242(b) (stating that "the jury shall be instructed to find . . . the defendant—(1) guilty; (2) not guilty; or (3) not guilty only by reason of insanity"). In support of his argument that IDRA required the district court to instruct the jury about the consequences of an insanity acquittal, the petitioner in *Shannon* pointed to language in the Senate Report on IDRA, which stated that "[t]he Committee endorses the procedure used in the District of Columbia whereby the jury, in a case in which the insanity defense has been raised, may be instructed on the effect of a verdict of not guilty by reason of insanity." *Shannon*, 512 U.S. at 583 (internal quotation omitted).

**[6]** The United States Supreme Court refused to give weight to this passage of legislative history unattached to the text of IDRA: "We are not aware of any case . . . in which we have given authoritative weight to a single passage of legislative history that is in no way anchored in the text of the statute." *Id.* The Court emphasized that the passage of legislative history Shannon identified "[did] not purport to explain or interpret any provision of the IDRA." *Id.* The Court concluded by stating that " 'courts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.' " *Id.* at 584 (alterations in original) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB*, 814 F.2d 697, 712 (D.C. Cir. 1987)); *see also Abrego v. Dow Chem. Co.*, 443 F.3d 676, 686 (9th Cir. 2006) (per curiam) (holding that statutory silence, "coupled with a sentence in a legislative committee report untethered to any statutory language," did not bring about a change in governing law). The Supreme Court thus made clear that principles in legislative history that have no statutory reference point

and do not purport to explain any part of an enacted law do not carry the force of law. As such, they do not bind *anyone* —administrative agencies included.

*Shannon* is not the only case illustrating that it is contrary to law for an agency to conclude that it is legally bound by language in a congressional committee report. In *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 646 (2005), the Secretary of Health and Human Services argued that unambiguous statutory language, when paired with conflicting legislative history, rendered a statute ambiguous. The Court held that the statute was not ambiguous, stating that "[t]he relevant case law makes clear that restrictive language contained in Committee Reports is not legally binding." *Id.* at 646 (citing *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); *UAW v. Donovan*, 746 F.2d 855, 860-61 (D.C. Cir. 1984) (Scalia, J.); *Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 552 & n.9 (Ct. Cl. 1980)); *see also Lincoln*, 508 U.S. at 192 ("[I]ndicia in committee reports and other legislative history as to how . . . funds should or are expected to be spent do not establish any legal requirements on [an] agency." (internal quotation omitted)).[11]

---

[11]The utility of legislative history stands on a different footing when it is tied directly to statutory language and that language is ambiguous. In such a case, the legislative history may permissibly inform judgment about interpreting ambiguous statutory terms. For example, in *Northwest Forest Resource Council v. Glickman*, we stated, "a congressional conference report is recognized as the most reliable evidence of congressional intent because it 'represents the final statement of the terms agreed to by both houses.' " 82 F.3d 825, 835 (9th Cir.1996) (quoting *Dep't of Health & Welfare v. Block*, 894 F.2d 895, 901 (9th Cir. 1986)). However, in that case, the statutory language was not silent on the relevant issue. *See id.* Here, by contrast, the passage of legislative history in question is unrelated to any provision of the statute that Congress has enacted. When legislative history is not tied to any statutory text, we properly should give it no weight. *See Abrego*, 443 F.3d at 683 ("[C]onsideration of legislative history is appropriate where statutory language is ambiguous. Ambiguity, however, is at least a necessary condition. In this instance, the statute is not ambiguous. Instead, it is entirely silent as to the burden of proof on removal." (citations omitted))

**[7]** The principle that committee report language has no binding legal effect is grounded in the text of the Constitution and in the structure of separated powers the Constitution created. Article I, section 7, clause 2 of the Constitution is explicit about the manner in which Congress can take legally binding action.[12] Members of Congress cannot use committee report language to make an end run around the requirements of Article I. If Congress wishes to alter the legal duties of persons outside the legislative branch, including administrative agencies, it must use the process outlined in Article I. *See INS v. Chadha*, 462 U.S. 919, 952 (1983); *see also Clinton v. City of New York*, 524 U.S. 417, 439-40 (1998) (holding that "the power to enact statutes may only be exercised in accord with a single, finely wrought and exhaustively considered, procedure" outlined in Article I (internal quotation omitted)). BPA acted contrary to law by treating committee report language—language that was not subjected to the bicameralism and presentment requirements of Article I—as imposing upon BPA a legal duty to transfer the functions of the FPC. Because the

---

[12]Article I, section 7, clause 2 of the United States Constitution provides:

Every bill which shall have passed the House of Representatives and the Senate shall, before it become a law, be presented to the President of the United States; if he approve; he shall sign it; but if not, he shall return it, with his objections, to that House in which it shall have originated, who shall enter the objections at large on their journal, and proceed to reconsider it. If after such reconsideration two thirds of that House shall agree to pass the bill, it shall be sent, together with the objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a law. But in all such cases the votes of both Houses shall be determined by yeas and nays, and the names of the persons voting for and against the bill shall be entered on the journal of each House respectively. If any bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Congress by their adjournment prevent its return, in which case it shall not be a law.

committee reports in this case were not subject to the "finely wrought" process in Article I, BPA erred by giving the reports binding effect.

**[8]** Treating legislative reports as binding law also undermines our constitutional structure of separated powers, because legislative reports do not come with the traditional and constitutionally-mandated political safeguards of legislation. As noted above, legislative reports are not acts of law satisfying the precise requirements of Article I, which were devised by the Framers to ensure separation of powers and a careful legislative process. By contrast, legislative reports may in some cases be written by an individual legislator, congressional staffers, or even lobbyists.[13] Giving binding effect

---

[13]The Supreme Court has cautioned:

> [L]egislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text.

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, ___, 125 S. Ct. 2611, 2626 (2005)).

Judge Kozinski has likewise observed:

> Reports are usually written by staff or lobbyists, not legislators; few if any legislators read the reports; they are not voted on by the committee whose views they supposedly represent, much less by the full Senate or House of Representatives; they cannot be amended or modified on the floor by legislators who may disagree with the views expressed therein.

*Wallace v. Christensen*, 802 F.2d 1539, 1560 (9th Cir. 1986) (en banc) (Kozinski, J., concurring).

Committee reports often contain "what some committee members wanted in the bill, but did not get," and are often written before the bill is drafted, *Puerta v. United States*, 121 F.3d 1338, 1344 (9th Cir. 1997), or after a bill is passed, *Lao v. Wickes Furniture Co., Inc.*, 455 F. Supp. 2d 1045, 1051 (C.D. Cal. 2006) (refusing to give weight to committee report issued ten days after the passage of a law).

to passages in legislative reports may thus give binding legal effect to the unchecked will of a lone person, and that is not what our Constitution envisions.

The statements of BPA Vice President Delwiche illustrate how BPA's reliance on legislative history undermined separation of powers in this case. Delwiche said that BPA, the agency he led, was "an Executive Branch agency, accountable to Congress." It is certainly true that Congress through legislation may direct how BPA shall operate. But an executive branch agency which views itself as subservient to a sentence in a legislative report undermines the distribution of authority in our federal government in which every exercise of political power is checked and balanced.

**[9]** BPA's treatment of legislative history as binding law also frustrated the statutory design of the Northwest Power Act. Rather than adhering to the Act's carefully-tailored requirement that BPA take actions consistent with the guidance provided by the Plan and Program crafted by the Council as well as the purposes of the Act, BPA simply gave conclusive weight to what might have been the view of a lone legislator, staffer, or lobbyist. That the Council, and guidance from it, derives from political and expert representatives from four Pacific Northwest states, affected Indian tribes, and groups with interest in fisheries only intensifies BPA's error in relying so heavily on congressional report statements that might have been penned by a single legislator or single lobbyist, and that do not satisfy Article I's requirements and do not have force of law. The Act contemplates a participatory process in which the varied constituencies of the Pacific Northwest advise BPA on how it should exercise its discretion. By following congressional committee report language as if it were mandatory law, BPA ignored the opinions of those individuals and groups directly affected by its policy choices and circumvented the unique structure of cooperative federalism created by the Act.

Delwiche incorrectly believed that the dominant factors in his decision about the continued operation of the FPC were statements in legislative history, untied to the legislative commands of Congress, when, to the contrary, his agency's organic statute, the Northwest Power Act, states that one of its purposes is to allow the States, local governments, and citizens of the Pacific Northwest (including fish and wildlife agencies and Indian tribes) to participate in the development of regional energy conservation plans, plans for renewable resources, and plans for environmental protection and enhancement. 16 U.S.C. § 839(3).[14]

The Act also requires BPA to exercise its authority in a manner consistent with the Council's Fish and Wildlife Program, *see id.* § 839b(h)(10)(A), the most recent version of which called for the continued operation of the FPC. Indeed, the Act makes no secret that BPA's actions "shall be consistent with the [Council's Fish and Wildlife] plan and any amendment thereto," *id.* § 839b(d)(2), as the Act recites the consistency requirement numerous times, *see id.* §§ 839b(h), 839c(d)(3), 839d(b)-(c). Possibly, BPA could exercise some discretion to depart from its prior practice of funding the FPC in accordance with the Council's Fish and Wildlife Program, if such a departure was necessary for BPA to comply with its statutory obligation to use its authority in a manner consistent with the Council's Power Plan or purposes of the Act. But no nice question of balancing potentially conflicting obligations is presented when BPA adopts a slavish adherence to a sentence in a legislative committee report.

---

[14]In *NRIC*, 35 F.3d at 1388, we recognized that the Council must give "due weight" to views of fishery managers, state and federal wildlife agencies, and Indian tribes in formulating the Fish and Wildlife Program. *See* 16 U.S.C. § 839b(h)(7). It follows with stronger logic that when the final Fish and Wildlife Program, the product of a collaborative process, calls for the continued operation of the FPC, BPA cannot then disregard the Council's view without giving the Council's view due weight. The Northwest Power Act requires BPA to act in a manner *consistent* with the Fish and Wildlife Program. *Id.* § 839b(h)(10)(A).

We may only sustain an agency's action on the grounds actually considered by the agency. As the Supreme Court explained in *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943), "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." In other words, the APA obliges us to set BPA's action aside unless the record demonstrates that, because BPA considered some other basis for its action, BPA's decision to transfer the functions of the FPC was not arbitrary, capricious, or contrary to law. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.").

B

BPA argues that, even if language in the congressional committee reports did not provide a rational basis for its action transferring the functions of the FPC, its decision can be upheld as a reasonable application of the Act's requirement that it exercise its authority in a manner consistent with the Council's Fish and Wildlife Program. BPA contends that it carefully considered the issues before it and therefore we should let stand its decision to transfer the functions of the FPC. The petitioners contend, by contrast, that BPA never considered the consistency provision of the Act in deciding to transfer the functions of the FPC and insufficiently analyzed the issues before it. Thus, petitioners urge that BPA acted arbitrarily and capriciously.

1

**[10]** Before further evaluating BPA's decision to transfer the functions of the FPC to Pacific States and Battelle, we

outline the principles governing the scope of our review under the arbitrary and capricious standard of § 706(2) of the APA. The Supreme Court has explained:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."

*Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 806 (9th Cir. 2005). That is, an agency must "cogently explain why it has exercised its discretion in a given manner," and "[i]n reviewing that explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *State Farm*, 463 U.S. at 43, 48 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 285 (1974)).

**[11]** An agency decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.[15]

---

[15]"Some courts have held that agency action is arbitrary and capricious if 'the agency has not really taken a 'hard look' at the salient problems and has not genuinely engaged in reasoned decision-making.'" *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1488 (9th Cir. 1992) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir.

In this case, BPA departed from its long-standing practice of funding a unitary Fish Passage Center and transferred the FPC's functions to two separate entities. An agency is entitled to change its course when its view of what is in the public's interest changes. However, "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) (footnotes omitted), *quoted in State Farm*, 463 U.S. at 57; *see also Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (plurality opinion) ("Whatever the ground for the [agency's] departure from prior norms, . . . it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate."); *W. States Petroleum Ass'n v. EPA*, 87 F.3d 280,

---

1970)). Accordingly, some commentators have suggested that our task in reviewing agency action under § 706(2) of the APA is to "look[ ] closely at whether the agency has taken a hard look at the question" before it, 33 Charles Alan Wright & Charles H. Koch, Jr., *Federal Practice and Procedure* § 8335 (2006) (emphasis omitted), though other commentators decline to adopt the "hard look" phraseology, *see* 2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 11.4 (4th ed. 2002) ("In order to avoid judicial reversal of its action as arbitrary and capricious, an agency must engage in 'reasoned decisionmaking,' defined to include an explanation of how the agency proceeded from its findings to the action it has taken."). Because the Supreme Court has never explicitly embraced the "hard look" approach to judicial review under the arbitrary and capricious standard of the APA, *cf. Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 695 n.9 (1980) (Marshall, J., dissenting) (stating that the arbitrary and capricious "inquiry is designed to require the agency to take a 'hard look' " at the issues before it), we adhere to the Supreme Court's explicit guidance in *State Farm* that an agency must cogently explain its actions and demonstrate a rational connection between the facts it found and the choice it made.

284 (9th Cir. 1996) (stating that an agency "must clearly set forth the ground for its departure from prior norms").

Moreover, in reviewing BPA's action, we must look to BPA's reasoning in making its decision to transfer the functions of the FPC, and not to other reasons for its decision that BPA might marshal before us. As the Supreme Court has explained, we "may not accept appellate counsel's post hoc rationalizations for agency action," *Burlington Truck Lines*, 371 U.S. at 168, and we "may not supply a reasoned basis for the agency's action that the agency itself has not given," *Bowman Transp., Inc.*, 419 U.S. at 85-86 (citing *Chenery*, 332 U.S. at 196).[16]

2

**[12]** In arguing that it sufficiently assessed the issues before it, BPA defends its decision as the outcome of "a public process within the confines of the 120-day transition period set by Congress." However, the administrative record does not show that BPA, as required by *State Farm*, considered the relevant facts and used a rational process to decide to transfer the functions of the FPC to other entities. Apart from the evidence in the record reflecting BPA's incorrect belief that it was required to follow the congressional committee report language, there is no evidence showing how BPA decided to

---

[16]BPA argues that its interpretation of the Northwest Power Act and its decision to transfer the functions of the FPC are entitled to substantial deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984), *Aluminum Co. of America v. Central Lincoln Peoples' Utility District*, 467 U.S. 380, 389 (1984), and their progeny in our court, *see, e.g.*, *APAC*, 126 F.3d at 1164. Perhaps BPA might be entitled to deference in this case if it was actually interpreting the Act, one of its organic statutes. However, as we discuss in the next section, there is scant evidence in the record that BPA, in deciding to transfer the functions of the FPC, was interpreting the Act's provision that it exercise its authority in a manner consistent with the Council's Fish and Wildlife Program, *see* 16 U.S.C. § 839b(h)(10)(A), or was interpreting any other provision of the Act.

transfer the functions of the FPC and to issue the December 8, 2005 Program Solicitation. This failure presents itself in high relief in light of the Council's program calling for the continued operation of the FPC. So far as the record is concerned, we have no explanation for why BPA would abandon the FPC in the face of its inclusion in the Council's Program, beyond the mistaken belief of BPA that statements in legislative reports were mandatory and foreclosed the continued funding of the FPC.

As evidence of the decision-making process BPA used to decide to award the contract for the functions formerly performed by the FPC to Pacific States and Battelle, BPA points to a PowerPoint slide from a presentation dated January 26, 2006, the same day BPA issued a press release announcing that it decided to transfer the FPC's functions to Pacific States and Battelle. In the slide BPA prepared, each bidder received an "X" for each of eight specified tasks[17] BPA determined the bidder could satisfactorily perform. In other words, a bidder who BPA concluded could perform all eight tasks satisfactorily would receive eight Xs, a bidder who could perform four of the eight tasks satisfactorily would receive four Xs, and so on. But there is no evidence in the record of how BPA determined whether a bidder would get an X or be left blank for each specified task. And even if the PowerPoint presentation did contain evidence of a rational decision-making process, it is uncertain whether BPA actually relied on that process in making its decision to transfer the functions of the FPC to Pacific States and Battelle because the PowerPoint slide was prepared on January 26, 2006, the very same day BPA announced it decided to award Pacific States and Battelle the contracts to perform the functions formerly performed by the FPC.

---

[17]The specified tasks were: database management; routine analysis and reporting; coordination of the smolt monitoring program; miscellaneous additional technical tasks; expanded, non-routine analysis; independent technical review; policy oversight and guidance; and coordination with other contractors.

As further purported evidence of the process which led BPA to decide to transfer the functions of the FPC to Pacific States and Battelle, BPA presents a memorandum comparing the functions of the FPC with the functions of the new model. However, the memorandum giving this comparison was drafted on March 13, 2006, a month and a half after BPA awarded the contracts for the functions formerly performed by the FPC to two other entities. BPA thus could not have relied on this memorandum in deciding to transfer the functions of the FPC and in awarding the contracts to Pacific States and Battelle.

BPA also indicated, in a letter to the Yakama tribe and a similar letter to five members of the Pacific Northwest's congressional delegation, that it believed the Program Solicitation complied with its duty, under the Act, to "mitigate the impact on salmon and steelhead in a manner consistent with the Program." But again, the letter does not reflect any rational decision-making process that BPA relied upon to conclude that transferring the functions of the FPC was in accord with its statutory duty to use its authority in a manner consistent with the Council's Fish and Wildlife Program.

In *Confederated Tribes*, 342 F.3d at 933, we held that BPA provided a reasoned explanation for its decision that implementing certain biological opinions was consistent with BPA's statutory mandate to treat fish and wildlife equitably with power because the record elaborated BPA programs, decisions, and opinions reflecting how BPA gave equitable treatment to fish and wildlife. By contrast, in this case, the only reference in the administrative record to the Act's consistency requirement is the letter from BPA to Yakama and the similar letter from BPA to five members of the Pacific Northwest's congressional delegation baldly asserting that BPA is transferring the functions of the FPC to comply with its statutory mandate to protect fish and wildlife consistent with the Program. But the record does not show the process, if there was one, that BPA used to determine that its decision

to transfer the functions of the FPC was consistent with BPA's statutory mandate to use its authority in a manner consistent with the Council's Fish and Wildlife Program. Because the 2003 Amendments to the Council's Program describe the functions the FPC should perform, BPA's record of decision should have shown reasons for its decision to transfer the FPC's functions elsewhere and how this would be consistent with the Council's Fish and Wildlife Program.

This case is more similar to *State Farm* than it is to *Confederated Tribes*. In *State Farm*, the Supreme Court held that the National Highway Traffic Safety Administration's ("NHTSA") decision to rescind a rule requiring automobile manufacturers to include passive restraints in their cars was arbitrary and capricious because the NHTSA provided " 'no findings and no analysis here to justify the choice made, no indication of the basis on which the [agency] exercised its expert discretion.' " *State Farm*, 463 U.S. at 48 (alteration in original) (quoting *Burlington Truck Lines*, 371 U.S. at 167). Just as the NHTSA had the authority to use its discretion to rescind the passive restraint rule in *State Farm*, so too BPA possibly may have the ability rationally to conclude that the continued operation of the FPC in its present state was no longer in the public interest, after giving due weight to the Act's requirement that its actions be consistent with what the Council said in the Program and Plan, and the purposes of the Northwest Power Act. "But an agency changing its course must supply a reasoned analysis . . . ." *Id.* at 57 (internal quotation omitted). BPA has not cogently explained its decision to transfer the functions of the FPC, and the record does not indicate that that decision was the output of a rational decision-making process. Instead, BPA departed from its two-decade-old precedent without supplying a reasoned analysis for its change of course.[18] BPA's decision to transfer the func-

---

[18]In its brief, BPA argues that it consulted with various fishery managers, one scientist, and the public in making its decision to transfer the

tions of the FPC was arbitrary and capricious.[19]

IV

[13] The United States Supreme Court has declared that we must require that an agency "cogently explain why it has exercised its discretion in a given manner." *State Farm*, 463 U.S. at 48. The only explanation shown in BPA's record for

---

functions of the FPC. BPA asserts that, in deciding which proposals to accept, it "consulted with tribal, state and federal fisheries managers"; "provided a forum in which to hold public discussion and debate on this issue"; "considered and largely followed the recommendations" of a group of Indian tribes and an association of fisheries; ensured that the Program Solicitation complied with the 2003 Amendments to the Fish and Wildlife Program; "followed the general principles from the U.S. National Academies scientific reporting process" in preparing the technical services agreement with the entities replacing the FPC; obtained "expert scientific review of the proposals" from the former executive director of the Columbia Basin Fish and Wildlife Authority; and "relied on the advice provided in letters from members of the Northwest congressional delegation, as well as the report language and the Program amendments." However, as we discussed, it does not appear from the record that BPA actually relied upon any of these rationales in deciding to transfer the functions of the FPC, and BPA may not justify its decision to our court based on these post-hoc rationalizations for its action. *See Burlington Truck Lines*, 371 U.S. at 168.

[19]BPA argues that its decision to transfer the functions of the FPC complies with its substantive obligation to exercise its authority "in a manner consistent with the plan, . . . the program adopted by the Council . . . , and the purposes of [the Northwest Power Act]," 16 U.S.C. § 839b(h)(10)(A), even though the 2000 Program and the 2003 Amendments "call[ ] for the continued operation of the Fish Passage Center." 2003 Amendments, *supra*, at 27. Because we hold that BPA's decision to transfer the functions of the FPC was not the output of a reasoned decision-making process, as the APA requires, we need not determine whether, on a proper record with factual determinations and an adequate explanation of a rational connection between facts determined and action taken, a decision of BPA to transfer the functions of the FPC is consistent with the Council's Fish and Wildlife Program and with the Plan and the objectives of the Northwest Power Act.

why it transferred the functions of the FPC was that it was responding to congressional committee report language that BPA believed created a binding obligation on it. That is not a cogent explanation because BPA acted contrary to law in concluding that congressional committee report language carried the force of law and bound BPA to transfer the functions of the FPC. Because BPA has not shown a rational basis for its decision to transfer the functions of the FPC to Pacific States and Battelle, we grant the petition for review. We hold that BPA's decision to transfer the functions of the FPC to Pacific States and Battelle was arbitrary, capricious, and contrary to law. We set aside BPA's decision to transfer the functions of the FPC to Pacific States and Battelle and order that BPA continue its existing contractual arrangement to fund and support the FPC unless and until it has established a proper basis for displacing the FPC.

**PETITION FOR REVIEW GRANTED.**